Nicholas A. Coulson, Esq. (SBN 358903)
nick@coulsonpc.com
**COULSON P.C.**
13101 Washington Blvd.
Suite 244
Los Angeles, California 90066
*Counsel for Plaintiff and the Proposed Classes*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **DAVID GAINES**, on behalf of himself and all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>**MICHAEL ROBERTSON and WEBINARTV, INC.**,<br><br>     Defendants. | Case No: \_'26CV3696 LL   DDL\_<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Hon. |

Plaintiff David Gaines ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, brings this Class Action Complaint and alleges, upon personal knowledge as to himself and upon information and belief and investigation of counsel as to all other matters, as follows:

**NATURE OF THE ACTION**

1. While participants gather in a private virtual meeting—a stranger is in the room. Watching. Recording. And within twenty-four hours, posting every word and every face online for the world to see, for profit.

2. This is a class action suit brought against Defendants Michael Robertson and his fictional alter-ego, an unincorporated entity that refers to itself as "WebinarTV, Inc." (collectively, the "Defendants") for systematically engaging in the unlawful interception, recording, use, and public dissemination of private and

**CLASS ACTION COMPLAINT**

access-restricted virtual-meeting communications, constituting a sweeping and egregious invasion of privacy rights.

3. Defendants operate a commercial online platform and search engine called WebinarTV (the "Platform") that hosts and provides public access to secretly-obtained audio-visual recordings of virtual meetings—meetings that were never intended for public dissemination and to which Defendants had no right to access, let alone record and disseminate.

4. Complaints from affected parties (among other sources) indicate that Defendants search and scrape the internet for surreptitious access to virtual meetings, then deploy deceptive and covert tactics to infiltrate those meetings and record them in real time, including registering for meetings under false identities or otherwise concealing their true identity, purpose, and intent to record. Defendants then repurpose and publish these unauthorized recordings on their Platform, rebranding the meetings as "webinars."

5. These audio-visual recordings are made and disseminated without the knowledge, consent, or authorization of the meeting host or participants, and capture the full substance of participants' communications as well as other sensitive personal information. Categorically, this includes faces, names, contact details, voices, and affiliations. This information is intended for a specific, contained, private audience, and ranges from nonpublic to confidential, proprietary, and/or deeply personal.

6. Plaintiff's experience illustrates Defendants' business model. Plaintiff convened a private, access-restricted virtual meeting for families and community members to discuss sensitive special-education issues involving children with disabilities. Plaintiff did not invite Defendants to attend, and Defendants did not disclose who they were or why they were there. Defendants secretly recorded the meeting, posted the recording on the WebinarTV Platform, and notified Plaintiff only after the recording had already been made available to anyone with an internet connection.

**CLASS ACTION COMPLAINT**

7. Through this scheme, Defendants deliberately invaded the privacy of thousands (or more) of unsuspecting individuals to gather content, attract users, and generate substantial commercial and financial gain.

8. The breadth, scale, and surreptitious nature of Defendants' misconduct pose a profound and ongoing threat to the privacy and security of all users of virtual meeting technologies.

9. Remarkably, this is not the first time Defendant Robertson has built a business on the unauthorized exploitation of others' content. In fact, it's very much his modus operandi. His prior ventures, including MP3.com and MP3Tunes, generated hundreds of millions of dollars through similar schemes of mass appropriation, each ending in legal judgment or settlement only after extensive litigation.

10. Plaintiff brings this action on behalf of himself and a class of all persons whose communications were unlawfully intercepted and disseminated by Defendants without prior authorization or consent.

## PARTIES

11. Plaintiff David Gaines, an individual, is a citizen and resident of Sacramento, California, where he intends to remain. Plaintiff Gaines is the founder and Chief Executive Officer of a Northern California non-profit organization called Sacramento Autistic Spectrum and Special Needs Alliance ("SASSNA"), which provides comprehensive social services to autistic and other neurodivergent youth and their families.[1]

12. Defendant WebinarTV, Inc. ("WebinarTV" or "Defendant WebinarTV") is purportedly an entity that owns and operates the WebinarTV Platform, including the website and related domains described herein.

   a. The Platform identifies its owner as "WebinarTV, Inc., a

---

[1] SASSNA, Sacramento Autistic Spectrum & Special Needs Alliance, https://www.sassna.org/ (last visited Apr. 27, 2026).

**CLASS ACTION COMPLAINT**

COULSON P.C.

COULSON P.C.

company operating under the laws of Delaware, located at 32225 Valley Center Road, Valley Center, CA 92082."[2]

b.    Undersigned counsel found no record of any such entity registered in Delaware's Division of Corporations or California's Secretary of State.

c.    Based on the absence of any verified corporate registration for Defendant WebinarTV, Inc., and on information and belief based on the totality of the facts alleged herein, it is either a sole proprietorship, or the alter ego, of Defendant Robertson.

d.    To the extent WebinarTV, Inc. is a legally cognizable entity, Defendant Robertson is its alter ego. Upon information and belief, Robertson has commingled personal and corporate assets, used WebinarTV as a vehicle to conduct his personal business affairs, exercised complete dominion and control over the entity, and structured it in a manner designed to insulate himself personally from liability for the unlawful conduct alleged herein. Adherence to the fiction of a separate corporate existence would, under these circumstances, sanction fraud and promote injustice.

13.    Defendant Michael Robertson, an individual, is a resident of San Diego, California, and a citizen of California for jurisdictional purposes.

a.    Defendant Robertson claims to be the founder, owner, and chief executive officer of WebinarTV and personally makes decisions regarding WebinarTV, and participates in, directs, exercises control over, and benefits from its activities.

b.    Defendant Robertson is WebinarTV's primary decision-maker and has actively directed, and continues to actively direct, its unlawful

---

[2] Terms of Service, WebinarTV, https://webinartv.net/ws/termsofservice (last accessed Apr. 21, 2026).

**CLASS ACTION COMPLAINT**

conduct. Upon information and belief, Robertson controls or directs WebinarTV's content-acquisition practices, recording practices, publication practices, user-notification practices, removal practices, monetization strategy, and public responses to complaints regarding unauthorized recordings.

c.    Defendant Robertson is an experienced technology entrepreneur who has repeatedly structured his companies around paper-thin legal justifications for obviously unlawful business models. His familiarity with the legal boundaries he is alleged to have crossed here is not incidental. It is central to the willful and knowing nature of the conduct alleged herein.

d.    Upon information and belief, Defendant Robertson is personally liable for the actions of Defendant WebinarTV both as its alter ego and as a direct participant who personally authorized, directed, and benefited from the unlawful conduct alleged herein.

e.    At all relevant times, Defendants acted individually and jointly, and each Defendant authorized, directed, participated in, benefited from, and/or ratified the conduct alleged herein.

## JURISDICTION AND VENUE

14.    The Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Electronic Communications Privacy Act of 1986 ("ECPA"), 18 U.S.C. §§ 2510-2523. Specifically, Plaintiff asserts claims under 18 U.S.C. § 2511 and seeks civil relief pursuant to 18 U.S.C. § 2520.

15.    The Court has supplemental jurisdiction over all other claims pursuant to 28 U.S.C. § 1367(a) as such claims are so related to the federal question claim in this action that they form part of the same case or controversy. These other claims arise from the same set of operative facts as the federal claim. Specifically, Plaintiff's California statutory, constitutional, common-law, and equitable claims arise from

Page 5

CLASS ACTION COMPLAINT

the same alleged course of conduct: Defendants' unauthorized access to, real-time recording, use, publication, and monetization of Plaintiff's and Class Members' virtual-meeting communications.

16. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interests and costs, at least one member of the proposed class is a citizen of a state different from the Defendants, and the number of members of the proposed Class exceeds 100 members. Upon information and belief, members of the proposed Nationwide Class include persons domiciled outside California whose communications were recorded and posted by Defendants.

17. The amount in controversy exceeds $5,000,000 because Plaintiff and the proposed Classes seek statutory damages, actual damages, compensatory damages, punitive damages where available, equitable and injunctive relief, attorneys' fees and costs where recoverable, and other relief arising from Defendants' alleged interception, recording, use, and publication of virtual-meeting communications on a nationwide scale.

18. The Court has personal jurisdiction over Defendants because each Defendant is a resident of California as described herein and does substantial business in this State. Furthermore, a substantial portion of the events giving rise to the claims occurred in this State. Defendant Robertson resides in California and, upon information and belief, in this District. The Platform identifies its owner or operator as located at 32225 Valley Center Road, Valley Center, California 92082, which is in this District. Defendants also directed the challenged conduct toward Plaintiff and other California residents, including by accessing, recording, publishing, using, and/or monetizing communications from California-based virtual meetings.

Page 6

**CLASS ACTION COMPLAINT**

19. Venue is proper in this District under 28 U.S.C. § 1391(b) because each Defendant resides in and does substantial business in this District. Furthermore, a substantial portion of the events giving rise to the claims occurred in this District. Specifically, Defendant Robertson resides in this District, the Platform identifies its owner or operator as located in this District, and Defendants operate, control, direct, and/or implement the challenged practices from this District. Defendants' recording, publication, notification, removal, monetization, and complaint-response practices were directed, controlled, and/or implemented in substantial part from this District.

## FACTUAL ALLEGATIONS

### I. THE WEBINARTV PLATFORM AND ITS BUSINESS MODEL.

20. The WebinarTV Platform is, at its core, a content theft operation dressed in the language of a legitimate technology business. Understanding what the WebinarTV Platform claims to be—and how dramatically that claim diverges from what it actually does—is essential context for the conduct alleged herein.

21. Defendants launched the WebinarTV Platform in or around 2023. The WebinarTV Platform purports to be a webinar hosting platform and search engine that offers on-demand access to webinars, as well as webinar technology, indexing, search, promotional, and marketing services.

22. Defendants own several similarly named domains using the monikers "webinartv" and "meetingtv" (e.g., webinartv.us; webinartv.net; webinartv.co; meetingtv.us; meetingtv.org) that all redirect to or mirror the same WebinarTV site. For the purposes of this Complaint, "WebinarTV Platform," "Defendants' Platform" and "the Platform" encompass all domains that redirect to or mirror the WebinarTV site, notwithstanding any minor or superficial differences in presentation.

23. Unlike WebinarTV Inc., MeetingTV, Inc. appears to be an actual corporation organized under the laws of Delaware. But each of the domains referenced in the preceding paragraph directs or redirects to a website that, in its

**CLASS ACTION COMPLAINT**

COULSON P.C.

"terms of service" (to which Plaintiff never agreed) purports to belong to WebinarTV, Inc., and does not claim to be owned or operated by MeetingTV, Inc.

24. In a June 2023 press release, Defendants reported receiving $280,000 in seed funding from external investors for the WebinarTV Platform.[3] This external investment confirms that the WebinarTV Platform operates as a commercial enterprise with the intent to generate profit, and that investors have provided capital in reliance on the Platform's content library and growth trajectory—a library built, as alleged herein, through the mass unauthorized recording of private virtual meetings.

25. As of the filing of this Complaint, the WebinarTV Platform advertises that it hosts more than 249,000 recordings it characterizes as webinars. Registered users can freely access all recordings on the site.

26. On April 21, 2026, the site advertised 221,645 available "webinars." By May 22, 2026, the site added over 16,000 additional "webinars," an increase of approximately 518 "webinars" per day.

**April 21, 2026**:



**May 22, 2026**:

---

[3] "WebinarTV Inc. Secures $280,000 in Seed Funding to Make Webinars Available for Everyone", June 16, 2023, OpenPR, https://www.openpr.com/news/3091023/webinartv-inc-secures-280-000-in-seed-funding-to-make-webinars (last accessed Apr. 23, 2026).

**CLASS ACTION COMPLAINT**

27.   The Platform's main page is the "Catalog," which contains Defendants' cache of purported "webinars," available in a wide variety of categories, including artificial intelligence, business, education, entertainment, health/fitness, medical, personal finance, politics, and technology, as well as recordings in different languages.[4]

28.   The WebinarTV Platform publicly and falsely represents that it "indexes only free and public webinars" and that private webinars "are not added" and "are not supported" on the Platform.[5] Those representations are material because the Platform itself acknowledges a distinction between public webinars and private or access-restricted meetings, while Defendants' actual practices, as alleged herein, disregard that distinction entirely.

29.   The WebinarTV Platform defines a "public" webinar as "open to the general public, meaning all who want to view the webinar are accepted" and a "private" webinar as one that "restricts access through various methods" such as requiring a passcode for approved participants, restricting admission, or employing other authentication processes.[6]

30.   These definitions are significant because, as alleged herein, Defendants systematically recorded and published meetings that satisfy their own definition of "private"—meetings that required passcodes, restricted admission through registration and screening, and employed authentication processes to limit attendance. Defendants' own publicly stated policy, in other words, prohibited the very conduct that forms the core of this lawsuit.

31.   Along with access to these recordings on its site, the WebinarTV Platform offers a fee-based promotional service called "Lead Advantage," which purports to "promote their webinars through web placements, email distribution, and

---

[4] https://webinartv.us/ondemand (last accessed June 16, 2026).
[5] FAQ, https://webinartv.us/ws/account/faq (last accessed June 16, 2026).
[6] FAQ, https://webinartv.us/ws/account/faq (last accessed June 16, 2026).

**CLASS ACTION COMPLAINT**

higher prominence directory listings."[7] The service encourages hosts "to bid for increased exposure,"[8] generating direct revenue for Defendants.

32.     The value of the WebinarTV Platform depends on the size, searchability, and perceived comprehensiveness of its content library. By rapidly accumulating hundreds of thousands of recordings, Defendants made the WebinarTV Platform appear more useful, authoritative, and commercially valuable to users, investors, advertisers, and webinar hosts.

33.     Defendants' ability to offer access to a large catalog of recordings, generate website traffic and derivative content, promote paid services, and attract users and investors depends on acquiring meeting content at scale. As alleged below, Defendants built that catalog by accessing, recording, using, and publishing virtual-meeting communications without prior authorization or consent.

## II.     DEFENDANTS SYSTEMATICALLY INFILTRATE AND SECRETLY RECORD VIRTUAL MEETINGS TO HARVEST CONTENT FOR WEBINARTV.

34.     For purposes of this Complaint, the term "meeting" broadly includes meetings, events, conferences, gatherings, sessions, webinars, meet-ups, roundtables, briefings, workshops, presentations, trainings, seminars, and all other similar sessions in which a specific group of people gather virtually for a specific purpose.

35.     The following allegations describe Defendants' systematic methods of identifying, accessing, recording, and publishing virtual meetings. These methods are not accidental or isolated. They reflect a deliberate, automated, and scalable infrastructure designed to operate at volume while evading detection. Each step in this process is a separate act of unlawful conduct.

---

[7] https://cyberalberta.ca/zooming-out-webinartvs-rampant-scraping-of-online-meetings (last accessed June 16, 2026).
[8] *Id.*

**CLASS ACTION COMPLAINT**

COULSON P.C.

36. Upon information and belief, public reporting, user complaints, publicly available examples of recordings on the WebinarTV Platform, Defendants' own statements, and Plaintiff's own experience as described herein, Defendants systematically scrape the internet to identify and infiltrate virtual meetings, including by searching for meeting IDs and links, registration links, and join URLs associated with Zoom and other virtual meeting platforms.

37. Upon information and belief, and based on the same sources described above, Defendants gain access to virtual meetings by deceptive and clandestine means, including but not limited to: (a) registering for meetings using false, misleading, or fictitious names, email addresses, information, and affiliations; (b) harvesting, scraping, guessing, or otherwise acquiring meeting IDs, passcodes, or join links from compromised sources, leaked postings, and/or unsecured calendars or files; (c) operating, deploying, and/or misusing artificial intelligence tools, automated scripts, and/or browser extensions to join, monitor, or record meetings without the knowledge or consent of the host or participants; (d) circumventing or exploiting access controls, authentication measures, screening protocols, or registration approval processes that meeting hosts implemented specifically to restrict attendance; (e) joining meetings as seemingly passive participants—with cameras disabled, microphones muted, and generic or false display names— specifically to avoid detection; and (f) disregarding explicit prohibitions posted by meeting hosts on unauthorized attendance, recording, or redistribution.

38. Upon information and belief, and based on the same sources described above, once inside a virtual meeting, Defendants deploy recording technology, including screen recording, screen capturing, and other audio-visual recording tools, to secretly intercept and record the meeting's audio and video content in real-time.

39. These recording tools operate silently and do not generate any visible notification to the host or participants that a recording is in progress. Unlike the built-in recording function on platforms such as Zoom—which notifies all participants

Page 11

**CLASS ACTION COMPLAINT**

COULSON P.C.

that a recording has started—Defendants' screen-capture and browser-extension-based recording methods are specifically designed to bypass such notifications, rendering them invisible to everyone in the meeting.

40.     The recordings capture both the audio and visual content of the meetings, capturing participants' faces, voices, names, organizational affiliations, contact information displayed in the meeting interface, and the full substance of the communications exchanged.

41.     Defendants' recording of participants' faces and voices also constitutes the capture of biometric identifiers—specifically, facial geometry and voiceprints—without notice or consent.

42.     These practices are intentionally designed to be undetectable to hosts and participants at the time of the meeting itself, leaving them no opportunity to object, exclude the recording participant, or take any protective action before the recording is complete and published.

43.     Defendants intercept and record these meetings without the knowledge, consent, or authorization of the host or participants. Any apparent or implied consent is invalid because it was obtained, if at all, through Defendants' fraudulent misrepresentation of their identity and purpose in attending (and redistributing) the meeting.

44.     These intercepted meetings are often private, restricted, confidential, or limited to certain participants, and are in all cases not intended or authorized for recording and/or dissemination by unauthorized third parties.

45.     The intercepted meetings include addiction recovery support groups, patient and caregiver support sessions, internal organizational meetings, shareholder briefings, educational workshops for specific communities, and other gatherings that no reasonable person would expect or want to become a public, broadcast-style presentation for mass consumption.

46.     Once a virtual meeting is recorded, Defendants repurpose and upload

Page 12

**CLASS ACTION COMPLAINT**

the secretly recorded meeting to the WebinarTV Platform, rebranding it as a "webinar," where it is made publicly available to any registered user—often within twenty-four hours of the meeting's conclusion, as Plaintiff's own experience confirms.

47.    The webpages for each recording on the WebinarTV Platform include purported "enhancements" such as AI-generated summaries, chapter markers, and derivative media including an AI-generated podcast episode derived from the recording's content. These AI-generated enhancements are not incidental features. They represent Defendants' active processing and commercial exploitation of the intercepted communications, transforming stolen meeting content into multiple derivative commercial products without the knowledge or consent of the participants. Thus, Defendants not only disseminate meeting participants' information across the internet, but also feed it into artificial intelligence models that pose their own set of substantial privacy concerns.

48.    In general, people whose meetings are recorded by Defendants learn of the recording only after publication, when Defendants (inconsistently) transmit a boilerplate notification email to the meeting host informing them that their meeting has been posted to the WebinarTV Platform and promoting the Platform's features and "marketing opportunities."

49.    While the precise wording of these emails varies, they generally inform the recipient that a recording of their meeting, which Defendants have rebranded as a "webinar," has been published on the WebinarTV Platform, highlighting the features of the webpage hosting the recording, and otherwise promoting the Platform's services. A sample of a notification email as described by a recipient is below:[9]

---

[9] https://www.linkedin.com/posts/rneogy_my-webinar-last-week-was-stolen-the-day-activity-7381063235782967296-i7Fs/ (last accessed Apr. 23, 2026).

**CLASS ACTION COMPLAINT**

COULSON P.C.

Rajkumari Neogy · 3rd+   + Follow   ⋯
CEO @ ibelong | We use relational neuroscience and epigenetic...
6mo · 🌐

My webinar last week was stolen.

The day after I presented AI & Workplace Wellbeing, I got an email from "sarah.blair@webinarTV.us".

Who said this:

"Your webinar is featured on the Phil & Amy Show. They talk about the highlights from your webinar - without giving away too much - to entice viewers. To listen to the show, click Highlights tab on the OnDemand page or click here."

This fake person goes on to say:

"Note: WebinarTV is designed to promote and market public webinars. If you don't want to participate, go here and click the Remove button. Your webinar will be automatically removed and future webinars avoided."

And...

"P.S. As a thank you for helping make WebinarTV the #1 webinar site, we're offering a select group of top hosts $2 for every person who views their webinar. To make that easy, we've created a message you can copy and send to your registrants. It includes the links to text and images, so every viewer will be credited to your account in the Lead Advantage system. You can view the email address of all viewers in the analytics section."

They had recorded my entire presentation, and included screenshots of my slides. WTH?!

I am sharing this with LinkedIn because apparently there is a Reddit thread all about "Sarah" and her "WebinarTV" company.

I have come up with work arounds for future sessions.

But for anyone else who has had their IP / work stolen, I am so very sorry for this violation. I wish our society was more respectful and accountable.

50.   In these notices, Defendants brazenly attempt to reframe the unlawful recording and publication as a benefit and promising marketing opportunity for recipients, encouraging victims of their surveillance to pay for promotional services on the very platform built from their stolen communications.

51.   Even when Defendants offer post-hoc removal options,[10] such measures are illusory remedies that occur only after the unlawful interception and dissemination have taken place and do not remediate the large-scale violation already committed—nor do they address the unknown number of users who may have viewed, downloaded, or shared the recording during the period it was publicly accessible, or recover peoples' information from sprawling AI models.

52.   Based on investigative reports, consumer complaints, and the types of

---

[10] FAQ, https://webinartv.us/ws/account/faq (last accessed June 16, 2026).

**CLASS ACTION COMPLAINT**

COULSON P.C.

meetings available on the WebinarTV Platform, Defendants also frequently fail to notify hosts of the recording's publication and fail to honor removal requests in a timely and complete manner.

53.    Defendants' failure to reliably notify hosts and honor removal requests is not a system malfunction or oversight. It is consistent with a business model that depends on maximizing the period during which stolen content is publicly accessible, driving user engagement, search engine indexing, and platform growth before the host even becomes aware that their meeting has been recorded.

54.    Seemingly recognizing the violative, offensive, and legally dubious nature of their own tactics, Defendants have publicly encouraged people to refrain from taking legal action, stating on their own platform that "It is not necessary to engage in a formal process or use an attorney" to have content removed.[11]

55.    The Platform's statement that affected persons need not "engage in a formal process or use an attorney" further confirms that Defendants anticipated (legal) objections to their recording and publication practices and sought to channel victims into a private removal process rather than legal action.

III.    **INDEPENDENT INVESTIGATIONS AND WIDESPREAD PUBLIC COMPLAINTS CONFIRM THE SYSTEMATIC NATURE OF DEFENDANTS' CONDUCT.**

56.    Independent investigative journalism and reporting, including a series of articles published by 404Media,[12] have documented Defendants' practice of secretly scanning for and recording virtual meetings hosted on platforms including Zoom and publishing them on the WebinarTV Platform for profit. This reporting is

_____

[11] FAQ, https://webinartv.us/ws/account/faq (last accessed June 16, 2026).

[12] 404Media is "journalist-founded digital media company exploring the ways technology is shaping-and is shaped by-our world." The site is "focused on investigative reports, longform features, blogs, and scoops about topics including hacking, cybersecurity, cybercrime, sex, artificial intelligence, consumer rights, surveillance, privacy, and the democratization of the internet." Who We Are, https://www.404media.co/ (last accessed Apr. 27, 2026).

**CLASS ACTION COMPLAINT**

based on interviews with affected individuals and organizations, technical analysis of Defendants' recording methods, and direct communications with Defendant Robertson—and it corroborates each of the core allegations in this Complaint.

57.   On March 24, 2026, 404Media published the first of its investigative reports documenting Defendants' practice of secretly recording meetings hosted on Zoom.[13]

58.   The March 24 report stated that WebinarTV "is secretly scanning the internet for Zoom meeting links, recording the calls, and turning them into AI-generated podcasts."

59.   404Media reported that it interviewed individuals and organizations who had their meetings recorded and published by WebinarTV, each of whom reported that they first found out their meeting was on the WebinarTV Platform only after WebinarTV contacted them directly via email to promote the Platform's services and its transformation of the meeting into an AI-generated podcast.

60.   At least one organization interviewed by 404Media had absolutely no knowledge that a recording of their meeting was on the WebinarTV Platform until 404Media itself notified them in the course of its investigation.

61.   A Zoom spokesperson told 404Media that, based on Zoom's review, WebinarTV had recorded meetings using browser extensions or other tools, and that it had no technical ability to prevent such recordings. This statement from Zoom—the industry-leading platform on which a substantial portion of the meetings at issue were hosted—confirms both the method of recording alleged herein and the practical impossibility of self-help remediation by affected hosts and participants.

62.   In a follow-up investigative article published on April 13, 2026,

---

[13] Maiberg, Emmanuel, "This Company is Secretly Turning Your Zoom Meetings into AI podcasts" Mar. 24, 2026, 404Media, https://www.404media.co/this-company-is-secretly-turning-your-zoom-calls-into-ai-podcasts/; Paywall free version: https://archive.ph/TYd4L#selection-681.18-681.345 (last accessed Apr. 27, 2026).

**CLASS ACTION COMPLAINT**

404Media reported that WebinarTV had posted recordings of meetings of anonymous addiction recovery groups, support groups for patients and caregivers, community organizations, as well as a meeting of nudists.[14]

63.     In response to 404Media's repeated requests for comment, Defendant Robertson stated that WebinarTV asks "every single person for permission to *promote* their webinars" and denied that recording and posting these meetings violates the privacy rights of their participants. His explanations are obviously false. As alleged throughout this Complaint, Defendants do not ask permission before recording and posting meetings—they record meetings covertly, notify hosts only after publication, and in many cases fail to notify hosts at all. Robertson's public denial in the face of documented evidence of systematic unauthorized recording demonstrates his awareness of the unlawful nature of WebinarTV's conduct and his deliberate choice to continue it regardless.

64.     The 404Media reports confirm that WebinarTV is secretly infiltrating, recording, and publicizing meetings and that affected individuals frequently learn of the recording only after Defendants contact them, if at all.

65.     Several organizations, including a university, a technology security organization, and a nonprofit, have issued warnings and reports identifying WebinarTV as a platform engaged in unauthorized recording and redistribution of virtual meetings.

66.     On November 14, 2025, Stanford University's Information Security Office published guidance warning Stanford community members about protecting their digital assets from companies that secretly join, record, and publish meeting content on their own sites for commercial purposes, specifically identifying

---

[14] Maiberg, Emmanuel, "WebinarTV Secretly Scraped Zoom Meetings of Anonymous Recovery Programs," Apr. 13, 2026, 404Media, https://www.404media.co/webinartv-secretly-scraped-zoom-meetings-of-anonymous-recovery-programs/ (last accessed Apr. 27, 2026).

**CLASS ACTION COMPLAINT**

WebinarTV as one such platform.[15]

67.    CyberAlberta, a cybersecurity initiative of the Government of Alberta, Canada, published an investigative report into WebinarTV's practices of scraping and publishing meetings without consent or authorization, after a meeting of the Government of Alberta was uploaded to the WebinarTV Platform without the government's prior knowledge or consent.[16]

68.    Among other things, CyberAlberta's report detailed that: (a) there are many reports on social media and online review platforms about WebinarTV's scraping and publicizing meetings; (b) many people report learning of the publication after receiving a boilerplate notification email from a person identifying herself as "Sarah Blair, VP of Communications, WebinarTV.us"; (c) some meeting hosts who reviewed their participant lists retroactively identified unfamiliar and suspicious users who had attended their meetings; and (d) analysis of the uploaded recordings on the WebinarTV Platform by CyberAlberta reveals they were made using screen capture technology rather than the platform's built-in record function, confirming that Defendants deliberately selected a recording method designed to avoid triggering the participant notification that Zoom's built-in recording function would generate.

69.    CyberAlberta's report concluded that WebinarTV generally gains access through third-party browser extensions, such as AI-powered transcription or auto-join tools, including Auto Join for Google Meet, Meet Auto Admit, OtterAI, and NotaAI.

70.    CyberAlberta further reported that the Chrome Web Store lists "at least

---

[15] "Protect Stanford Digital Assets from Online Video Scrapers," Newsroom, Stanford University IT, https://uit.stanford.edu/news/protect-stanford-digital-assets-online-video-scrapers (last accessed Apr. 21, 2026).

[16] "Zooming Out: WebinarTV's Rampant Scraping of Online Meetings," https://cyberalberta.ca/zooming-out-webinartvs-rampant-scraping-of-online-meetings (last accessed Apr. 30, 2026).

**CLASS ACTION COMPLAINT**

COULSON P.C.

one of the known extensions" used by WebinarTV—specifically, extensions named "GoToWebinar" & "Meeting Download Recordings"—as developed by WebinarTV."[17] This demonstrates that Defendants have not merely exploited third-party tools but have themselves developed and distributed browser extensions specifically designed to facilitate the unauthorized recording of virtual meetings.

71.    The CyberAlberta report further noted that multiple users reported unauthorized content uploads and consistently ineffective removal procedures, with some hosts reporting that their removal requests were ignored entirely and their recordings remained publicly accessible on the WebinarTV Platform for weeks or months after the request was submitted.

72.    On March 31, 2026, a non-profit foundation in California that operates patient and caregiver support groups issued a warning to its patient support groups members about Defendants having secretly recorded one of the foundation's private caregiver support group meetings on Zoom.[18]

73.    The foundation's published account details that: (a) the link to join the meeting was not publicly available; (b) the registration form required participants to answer multiple questions, including confirming their relationship to the individual they were supporting; (c) on the day of the meeting, participants were admitted one at a time only after cross-referencing their name against the pre-approved registration list; (d) there were no visible AI tools or recording indicators running during the meeting; (e) the meeting was intended to be a strictly private discussion, not to be recorded or distributed under any circumstances; (f) Defendants contacted the foundation via email the day after the meeting, notifying them that the meeting had been posted to the WebinarTV Platform and soliciting the Platform's services;

---

[17] https://support.goto.com/webinar/help/manage-recordings.

[18] "A Warning For Patient Communities Connecting on Zoom," March 31, 2026, https://gdatf.org/a-warning-for-patient-communities-connecting-on-zoom/ (last accessed June 16, 2026).

**CLASS ACTION COMPLAINT**

and (g) the foundation determined through its own investigation that at least one fake registrant had successfully infiltrated and attended the meeting.

74.    These investigations and reports collectively demonstrate that Defendants are systematically and secretly infiltrating, recording, and posting meetings without authorization, consent, or the knowledge of the host or participants, and that this conduct is not limited to any single platform, industry, or type of meeting. It is a pervasive, ongoing scheme that affects individuals and organizations across every sector of society.

75.    In addition, there are extensive public complaints posted across numerous online platforms that describe the same pattern of conduct alleged herein: covert recording without notice, post-hoc notification emails promoting WebinarTV's services, and ineffective or ignored removal requests. By and large, those who have complained are uniformly outraged, confused, concerned, and offended by Defendants' conduct. Representative samples of these public complaints are below:

**Sample 1**.[19]

---

[19] https://www.linkedin.com/posts/robenglandattwohills_scam-alert-webinartvus-which-seems-to-be-activity-7353195147448274945-A-Sf/

**CLASS ACTION COMPLAINT**

Rob England · 3rd+
Making work better since 2005
9mo · Edited · 🌐

+ Follow    ···

SCAM ALERT #webinartv.us which seems to be affiliated with meetingtv.us
These guys will scrape LinkedIn and/or Facebook (not sure which) for upcoming
online Zoom webinars/meetings, register for them - presumably by bot, then screen
scrape the webinar, upload your webinar to their website without permission, then
spam email you in the following days.

The founder of meetingtv is Michael Robertson https://lnkd.in/gvJFpJRi in San
Diego [he showed up in the comments] whose profile website link is webinartv, and
who says "copying isn't thievery" https://lnkd.in/gjAAE_dv

Their registration is reasonably well disguised, it looks typical. Ours
used verarodgers@bestwest.space. But we chucked them out when there was no
camera or response (and our webinar was in Vietnamese 😄). They'll soon fix that by
having an AI avatar there to fake it. So there's no easy way to keep the b*****s out,
except to charge for every event...?

See this Reddit thread for more https://lnkd.in/gbHznYTX

Note that AVG blocks webinartv as a blacklisted "dangerous website".

⚫🟢🟠 67                                    91 comments · 13 reposts

## Sample 2.[20]



Katrine Jonasen ✓ · 3rd+                          8mo  ···
Head of Technology at GynZone ApS

Michael Robertson In fact I did both :) Across all our previous
encounters with your company (in 2022, 2023, 2024), your team has not
answered any emails when we asked to have our copyrighted content
removed. Nor did they answer phone calls, voice mail, LinkedIn
messages, or anything of the sort. The only way I have had any luck with
not being ignored has been when I asked for a meeting. So I figured that
was the easiest way to get our content down this fourth time around.
Turns out writing with you here was much quicker :)

Like · ⚫🟣 8 | Reply

## Sample 3.[21]

---

[20] https://www.linkedin.com/posts/robenglandattwohills_scam-alert-webinartvus-which-seems-to-be-activity-7353195147448274945-A-Sf/

[21] https://community.zoom.com/meetings-2/stolen-recording-by-webinartv-us-18419/index2.html#post118458 (last accessed Apr. 23, 2026)

**CLASS ACTION COMPLAINT**

COULSON P.C.



**Sample 4**[22]



Lisa Andria
Newcomer · 1 month ago

They just did it to me too!! I sent them a cease and desist and told them to remove it from the website IMMEDIATELY!!! It was a private meeting with a private FaceBook group. OMG!!!! I cannot believe they did that!!! I will follow up to make sure it is removed. And now I know... if a person joins that I do not know and they don't talk or show themselves... they will be removed. WATCH OUT EVERYONE!!!!!

**Sample 5**[23]

---

[22] *Id.*

[23] *Id.*

**CLASS ACTION COMPLAINT**

COULSON  P.C.



**Sample 6.**[24]



**Sample 7.**[25]

[24] *Id.*

[25] https://www.trustpilot.com/review/webinartv.us (last accessed Apr. 23, 2026)

**CLASS ACTION COMPLAINT**



## Sample 8.[26]



## Sample 9.[27]

---

[26] *Id.*
[27] *Id.*

Page 24

**CLASS ACTION COMPLAINT**



## Sample 10.[28]



## Sample 11.[29]



---

[28] *Id.*

[29] *Id.*

**CLASS ACTION COMPLAINT**

COULSON P.C.

## Sample 12.[30]



## Sample 13.[31]

## Sample 14.[32]

[30] https://www.youtube.com/watch?v=txG_KKydlBQ
[31] https://www.bbb.org/us/ca/valley-center/profile/online-publications/webinartv-1126-1000155072/customer-reviews (last accessed Apr. 23, 2026).
[32] *Id.*

**CLASS ACTION COMPLAINT**

**Initial Complaint**

Date: 02/26/2026

Type: Service or Repair Issues

Status: Unanswered

It has come to ████ attention that ████ has been improperly accessing, recording, and posting ████ confidential internal meetings, webinars, and conference calls on its website, reportedly through the use of artificial intelligence-based notetaker bots or similar automated tools (collectively, "AI Bots"). ████ did not authorize WebinarTV or any affiliated party to access, attend, record, transcribe, or publish any of ████ internal communications in any form.

76. The substance and scale of public complaints demonstrate that Defendants' unlawful actions are not isolated incidents but rather the predictable and systematic output of a deliberate business model that treats private virtual communications as raw material to be harvested, processed, and sold. The substance and scale of public complaints further placed Defendants on notice that hosts and participants objected to Defendants' access, recording, publication, and removal practices.

77. Defendants are aware of these complaints and have publicly responded to some of them, largely denying wrongdoing, characterizing intercepted private meetings as public webinars, and promoting the Platform's "features," while simultaneously continuing the very unlawful practices the complainants describe. Samples of these responses are below:

**CLASS ACTION COMPLAINT**





Page 28

**CLASS ACTION COMPLAINT**



**WebinarTV**
Date: 10/06/2025

WebinarTV is a search engine for free and public webinars. We are registered with the US ▓▓▓▓ as a service provider and abide by the ▓▓▓▓. We providie free services for webinar hosts including hosting (unlimited storage), chapters (like ▓▓▓▓ which increase viewing by 420%), professional quality promotional video, comprehensive slideshow, search within the webinar, and translation - all for free.

Whenever a webinar is added we send a notification to the host informing them of the addition. A vast majority want the free services and additional viewers, but for those that don't that's OK too. They can click one button to be removed. No login or account creation is required. If they click the Remove button then the webinar is automatically and instantly removed and future webinars by that host are avoided.

We never catalog private webinars - only webinars free and open to the public. Never paid webinars. Never private webinars, only those available to everyone on the net. There's more information in the ▓▓▓▓ on ▓▓▓▓. We think webinars are an awesome and untapped educational channel. We encourage people to search for any category of interest at ▓▓▓▓ (OR) try the video context search engine at ▓▓▓▓ to see what the world of webinars is saying about any topic.

Michael Robertson ✓ · 3rd+          8mo  ···
MR

WebinarTV.us is a legitimate search engine of webinars that gives the power to webinar hosts to decide if they want to be listed. It provides marketing and powerful services for free and public webinars who desire it. They create chapters for webinars making them better to find information. They have search so you can find any words mentioned in a webinar. They create  ...more

Like · 👍😊 5  |  Reply · 36 replies

See previous replies

Michael Robertson ✓ · 3rd+          7mo  ···
MR

This is a good example of how we give 100% of the power to the host. We send an email to hosts immediately when a webinar is added. If they don't want the free hosting and AI services provided (chapters, translation, preview video, transcription, search, etc.), they can click REMOVE. The webinar will be removed. No other search engine gives this control and immediacy to users.

If you click the link you pasted above, you will see the REMOVE button and if you click it then the webinar will be removed. (I attached a screenshot.) It is an entirely automated process. If you don't want to click, then you can read the FAQ on the website and send us email with details and customer support will remove it.

Please let me know if you have any issues. Thanks.



Like  |  Reply

Page 29

**CLASS ACTION COMPLAINT**

COULSON P.C.

78. Defendants' public responses are significant because they show that Defendants knew affected hosts and participants objected to the recordings, knew that the WebinarTV Platform was being accused of posting private or unauthorized meetings, and nevertheless continued to operate the WebinarTV Platform and defend the same challenged practices.

## IV. THE WEBINARTV PLATFORM CONTAINS HUNDREDS OF RECORDINGS THAT, ON THEIR FACE, COULD NEVER HAVE BEEN LAWFULLY OBTAINED.

79. The WebinarTV Platform claims to host only public webinars, yet WebinarTV's own content refutes that claim. A brief review of the recordings publicly available on the WebinarTV Platform reveals countless meetings that, on their face, reflect that the underlying meeting could not have been legitimately attended by unauthorized third parties, recorded, or publicly disseminated.

80. Such recordings include meetings: (a) explicitly marked as confidential or proprietary; (b) expressly limited to members, clients, shareholders, or specifically invited participants; (c) explicitly stating that recording by participants or redistribution to third parties was prohibited; and (d) identified as internal, closed, or non-public by their own titles, descriptions, or introductory content.

81. These categories of recordings are not edge cases or anomalies on the WebinarTV Platform. They appear throughout the catalog, across every subject matter category, and in significant numbers. Their presence on the WebinarTV Platform is not consistent with any legitimate content acquisition process. It is consistent only with a systematic practice of recording meetings without regard to their private or restricted nature.

82. The WebinarTV Platform hosts recordings of meetings involving government bodies, nonprofits, universities, health organizations, entrepreneurs, businesses, shareholders, professional communities, religious organizations, community groups, fraternities and sororities, and numerous other organizations and communities.

---

**CLASS ACTION COMPLAINT**

83.    The following are representative—not exhaustive—examples of recordings available on the WebinarTV Platform that could not plausibly have been obtained through any legitimate, consensual process. These examples are drawn from a brief review of the WebinarTV Platform conducted in connection with this litigation and are documented in the screenshots included in this Complaint.

**Sample 1.**[33]





**Sample 2.**[34]



---

[33] https://webinartv.us/watch/a743d1b63220b7573d120d509cc436bf0d58c559 (last accessed Apr. 23, 2026).

[34] https://webinartv.us/watch/4f3a7c10afe12869b846818144b58391c4bf5628 (last accessed Apr. 23, 2026).

**CLASS ACTION COMPLAINT**

## Sample 3.[35]

**NCNW Job Fair**
Wed, Oct 22nd 2025 @ 12:00PM EDT                                                                                Englis
Thank you for registering to attend the NCNW Job Fair! Please Note: ● This presentation will be recorded and housed at NCNW HQ. ● Participants are NOT to record this session, and participants are not permitted to add this content to a 3rd party platform without prior written consent from NCNW. ● We also require that you remove any AI assistants from this session.

#24552 (Business)    ( ? )
#96284 of 223809 (Overall)                                                                    **Watch**

## Sample 4

**\*Strategy\* Bradesco BBI | Best LatAm Ideas for Q4: The best may still be to come | Oct 1 @ 10 AM EDT | 11 AM B...**
Wed, Oct 1st 2025 @ 10:00AM EDT                                                                                Englis
CONFIDENTIALITY NOTICE This is a closed event, intended exclusively for Bradesco BBI clients and invited institutional investors. The content presented is confidential and must not, under any circumstances, be recorded, reproduced, or disclosed to third parties without express authorization. The presence of uninvited third parties, including journalists or media representatives, is not permitted. If you fall into this category, we

#26898 (Business)    ( ? )
#105132 of 223810 (Overall)                                                                    **Watch**

## Sample 5.[36]

**Hear Directly from a Senior FTC Official on the Recent Warning Letters and Dealer Advertising**
Mon, Apr 6th 2026 @ 1:00PM EDT                                                                                Englis
\*\* This webinar is not open to members of the media or the public. \*\* On March 13, the FTC announced it was sending letters to 97 dealership groups warning them of potential violations of federal advertising laws. Join NADA and a senior FTC attorney for an informative webinar that will provide more information about the warning letters and the agency's views of dealer advertising. This is a unique opportunity to hear directly from ...

#1824 (Business)    ( ? )
#7855 of 223815 (Overall)                                                                    **Watch**

## Sample 6.[37]

**Fair Isaac Corporation (FICO) Fireside Chat with CEO & CFO**
Thu, Dec 18th 2025 @ 2:00PM EST                                                                                Englis
IMPORTANT DISCLOSURE: This event is only for Jefferies clients. Members of the Media and the Press are not authorized to attend this event. If you work for the Media or the Press, you are prohibited from participating. The content presented at this event is proprietary to, and/or subject to the copyrights of, Jefferies or third parties. As a matter of legal compliance, we remind you that you must not attempt to elicit from any speak...

#15497 (Business)    ( ? )
#61273 of 223818 (Overall)                                                                    **Watch**

## Sample 7.[38]

---

[35] https://webinartv.us/watch/b23cc21aefafebd4545995fd04e4f5777d9785ab (last accessed Apr. 23, 2026).

[36] https://webinartv.us/watch/54cf0276646977acd75eb0059641b3083f8cd081 (last accessed Apr. 23, 2026).

[37] https://webinartv.us/watch/1c5b794cff5995d591283cb046f4031dd4eef84b (last accessed Apr. 23, 2026).

[38] https://webinartv.us/watch/2fbc4df4079927987bb49aff3d5d4e6c905513ef (last accessed Apr. 23, 2026).

**CLASS ACTION COMPLAINT**



**SuperCrowd Impact Member Private Networking Sesh**
Tue, Jan 27th 2026 @ 1:30PM EST
Join this practical roundtable where founders, fund managers, and securities counsel candidly discuss the realities of Reg CF fundraising, platform selection, and back-office headaches. Learn why community traction and early distributions drive investor conversions, how SPVs or debt-servicing platforms can simplify administration, and how donor-advised funds (via intermediaries like Abundance Capital) can unlock mission-align...

#11759 (Business)
#46544 of 223830 (Overall)

Watch

## Sample 8.[39]



**Closed briefing with UNDP OAI on 2026 Audit and Investigations Plans**
Fri, Jan 23rd 2026 @ 3:00PM EST
Watch this closed briefing to understand how UNDP's Office of Audit and Investigations is preparing for 2026 under tight budgets, relocation pressures, and rising casework. Leaders from OAI explain the 2026 risk-based audit program, field audit coverage, and why 2025 was a record year for investigations. Learn how OAI is using AI and data analytics to speed investigations, prioritizing cases through refined intake triage, and pla...

#12131 (Business)
#48200 of 223811 (Overall)

Watch

## Sample 9.[40]



**Master Members Only Q&A Session**
Wed, Dec 24th 2025 @ 11:00AM EST
Join this year-end Master Member Q&A for a practical walkthrough on hedge design, commodity-cycle LEAP strategies, and options-based trade management. Patrick and the team answer member questions on Amgen breakouts, MP Materials opportunistic option sales, delta-dollar sizing with Majestic Silver, and an Nvidia ratio backspread case study. The session blends live chart demos, simulated-account math, and clear guida...

#15187 (Business)
#60005 of 223818 (Overall)

Watch

## Sample 10.[41]



**Members Only LIVE Trading with Bob Beckett**
Fri, Nov 7th 2025 @ 3:00PM EST
Watch a candid live trading session that mixes actionable intraday tactics with hard-earned trading psychology. The host breaks down VWAP and short-duration setups, demonstrates order management live amid platform hiccups, and shares a mindset framework that turned repeated evaluation failures into payouts. Packed with real chat shout-outs, trade analysis, and relatable personal stories, this stream is valuable for anyone ...

#22172 (Business)
#87040 of 223820 (Overall)

Watch

## Sample 11.[42]

[39] https://webinartv.us/watch/07c0e7f3c94cb6adb37f2357034bd30147f730fb (last accessed Apr. 23, 2026).

[40] https://webinartv.us/watch/c798af842b7592a1447f71412a69c6f1eae89897 (last accessed Apr. 23, 2026).

[41] https://webinartv.us/watch/84a4bc95bfcd98ca8c7a7b944f5a7c9b66599f7c (last accessed Apr. 23, 2026).

[42] https://webinartv.us/watch/2fbc4df4079927987bb49aff3d5d4e6c905513ef (last accessed Apr. 23, 2026).

**CLASS ACTION COMPLAINT**

COULSON P.C.



**FFIP Weekly Mastermind Session:**
Tue, Oct 7th 2025 @ 10:30AM EDT

Get inspired every week to understand the current market scenario, better investment avenues, and clarify all your queries to create a life of freedom income and positively impact your lives. This is a private webinar exclusively for all the PAID MEMBERS of the Financial Freedom Implementation Program. Stay connected. Tune in every week. Treat this like recharging your batteries every week. I wish you great success in your Fin...

#4849 (Personal Finance) ?
#103131 of 223825 (Overall)

English

Watch

**Sample 12**[43]

**Jim Zaspel's Private Briefing -- 10 Lessons**
Thu, Jan 22nd 2026 @ 4:00PM EST

I've bought or wholesaled over 1,200 houses over the course of the past 17 years. In this training, I'll share 10 impactful lessons that I've learned over those 17 years!

#12279 (Business) ?
#48911 of 223827 (Overall)

English

Watch

84.     This sampling of recordings on the WebinarTV Platform demonstrates the falsity of Defendants' public claim that the Platform indexes only free and public webinars. It demonstrates, instead, that Defendants systematically record and publish meetings despite their private, restricted, and/or confidential nature—acquiring content through whatever means are available, publishing it for commercial gain, and leaving the victims to discover the violation after the fact, if at all.

V.     **DEFENDANTS INFILTRATED PLAINTIFF'S PRIVATE MEETING CONCERNING VULNERABLE CHILDREN, RECORDED EVERY WORD, AND POSTED IT PUBLICLY WITHOUT PLAINTIFF'S KNOWLEDGE OR CONSENT.**

85.     Plaintiff Gaines is the founder and Chief Executive Officer of the Sacramento Autistic Spectrum and Special Needs Alliance ("SASSNA"), a Northern California non-profit organization dedicated to serving autistic and other neurodivergent youth and their families. SASSNA provides a range of critical social services to some of California's most vulnerable children and their caregivers, including community organizing, educational advocacy, and support resources for

---

[43] https://webinartv.us/watch/673805444c758c32776ab87a87646568ec64eb4b (last accessed Apr. 23, 2026).

**CLASS ACTION COMPLAINT**

COULSON P.C.

families navigating the special education system.

86.     On or about January 2026, Plaintiff organized and hosted a virtual meeting that was specifically intended for parents, caregivers, students, and community members in a specific Sacramento-area school district and special education community using the Zoom videoconferencing platform.

87.     Plaintiff joined the meeting on his smartphone using the Zoom application.

88.     The meeting was not open to the general public. It was specifically intended for parents, caregivers, students, and community members with a direct connection to the specific Sacramento-area special education community and school district and aligned with the purpose and goals of the meeting. It was not intended for individuals lacking such a connection.

89.     In announcing the meeting, Plaintiff expressly reserved the right to decline, remove, or exclude any attendee at his discretion.

90.     Plaintiff implemented a registration and approval process to screen out inappropriate or unintended attendees, including individuals without a legitimate connection to the community served, those with interests adverse to the intended audience, or those unlikely to respect the sensitive and confidential nature of the discussion.

91.     Attendance required completion of a multi-question registration form establishing the registrant's connection to the relevant school district and community, followed by advanced approval from Plaintiff before any access information was provided. Registrants received the meeting credentials—including the meeting link and any required passcode—only after completing the registration process and receiving Plaintiff's express approval. Access information was never posted publicly.

92.     The meeting was intended to facilitate a candid and confidential private discussion concerning special education challenges, advocacy strategies, and

Page 35

resource needs for families in a specific Sacramento-area school district.

93.   During the meeting, participants shared deeply personal information about their children's lives. Participants discussed their children's highly personal and sensitive experiences, including their diagnoses, their struggles within the school system, their unmet educational needs, their behavioral and developmental challenges, and the emotional and financial toll these circumstances have placed on their families. Many participants spoke candidly and vulnerably, trusting that their words would remain within the confines of a private and supportive community gathering.

94.   Several of the participants had their cameras on, showing their faces on-screen.

95.   Plaintiff did not record the meeting. No recording of the meeting was authorized, planned, or conducted by Plaintiff or any other legitimate participant.

96.   In the meeting announcement, and consistent with the private nature of the gathering, Plaintiff informed participants that the meeting was private and that recording or redistribution of any kind was expressly prohibited. This prohibition was communicated clearly and was understood by all legitimate participants.

97.   Unbeknownst to Plaintiff and every legitimate participant in the meeting, Defendants had infiltrated the meeting by (upon information and belief) either (1) deploying an apparently fake registrant—a person operating under a false identity and fabricated credentials specifically designed to deceive Plaintiff's screening process and gain unauthorized access to the private gathering ("the fake registrant"); and/or (2) surreptitiously using an attendee's "browser extension" to record the meeting without knowledge or consent of any meeting participants.

98.   In furtherance of this infiltration, Plaintiff suspects that Defendants' fake registrant completed Plaintiff's registration form using false information, falsely representing a connection to the Sacramento-area special education community that did not exist, for the sole purpose of obtaining Plaintiff's approval

---

**CLASS ACTION COMPLAINT**

COULSON P.C.

and gaining access to the meeting.

99.    Because the apparently fake registrant appeared, on paper, to have a legitimate connection to the community, and because Plaintiff was acting in good faith to serve the families who had registered, Plaintiff was deprived of the opportunity to exclude it from the meeting, as he would have done had he known the registrant was not legitimately part of the intended community.

100.   In the meeting, the apparent fake registrant kept their camera off, did not speak or otherwise participate, and used a display name that gave no indication of their true identity or affiliation—behavior consistent with the covert surveillance function they were serving rather than the genuine community participation that was the meeting's purpose.

101.   While Plaintiff and the other participants spoke openly and candidly—trusting the privacy of their gathering—Defendants were silently recording every word, every face, and every disclosure, capturing intimate details about vulnerable children and their families for commercial exploitation.

102.   The day after the meeting, Plaintiff received an email from a WebinarTV representative notifying him that a recording of his meeting had (already) been posted to the WebinarTV Platform as a "webinar." This was the first notice Plaintiff had received that his private meeting had been infiltrated, recorded, and made publicly available.

103.   Plaintiff did not authorize, consent to, or have any knowledge of Defendants infiltrating, attending, recording, or disseminating the private meeting at any point before receiving WebinarTV's notification email.

104.   Upon receiving WebinarTV's notification email, Plaintiff clicked on the link that directed to Platform webpage where the recording had been posted and immediately reviewed the page. Based on the thumbnail picture of the recorded meeting and the other information on the page, including the title and summary descriptions, he found that the recording captured the full substance of the meeting—

**CLASS ACTION COMPLAINT**

the participants' faces, their names as displayed in the Zoom interface, their voices, and the sensitive personal disclosures they had made about their children's disabilities and educational struggles. The recording was publicly accessible to any registered WebinarTV user.

105.    Plaintiff was devastated, furious, and profoundly offended to learn that his carefully organized and deliberately protected community meeting—a gathering of parents who had trusted him with their most personal concerns about their children—had been secretly recorded and made available for public viewing and used for Defendants' commercial purposes.

106.    Plaintiff was particularly distressed by his awareness that the other participants in the meeting—parents who had come to him for community support—had also been secretly recorded without their knowledge or consent, and that their personal disclosures about their children had been made publicly accessible without any notice to them whatsoever. Plaintiff bears a deep sense of responsibility to the community he serves, and Defendants' conduct has undermined his ability to provide a safe and confidential space for that community.

107.    After receiving the email, Plaintiff immediately reviewed the meeting's registration records and identified a registrant whose information, upon further review, he believed to be fake. The fake registrant registered under the name "Marcia Gordon" with the email address "marciagordon@greenisp.online".

108.    The apparently fake registrant had completed all elements of the registration and screening process using false information to attend the private meeting. Upon information and belief, the registrant was acting as an agent of Defendants and attended the meeting for the sole purpose of conducting the unauthorized recording that subsequently appeared on the WebinarTV Platform.

109.    The registrant's earlier failure to respond to a pre-meeting verification email from Plaintiff—which Plaintiff had noted at the time but attributed to the registrant's potential oversight—was, in retrospect, consistent with the operation of

COULSON P.C.

a fabricated identity.

110.   Prior to receiving the email from WebinarTV, Plaintiff had believed the registrant to be a parent in the community and a legitimate attendee. He had no reason to believe otherwise. Defendants' deception was specifically designed to be indistinguishable from legitimate participation.

111.   In light of the recording that appeared on the WebinarTV Platform within twenty-four hours of the meeting's conclusion, upon information and belief, Defendants' fake registrant was deployed by Defendants to infiltrate and record the meeting in real time using screen capture or similar covert recording technology, and immediately transmitted the recording to Defendants for processing and publication on the WebinarTV Platform.

112.   The WebinarTV notification email and the posting of the unauthorized recording to the WebinarTV Platform—including the near-immediate timing of the posting within twenty-four hours of the meeting—together demonstrate beyond reasonable inference that the fake registrant was deployed and directed by Defendants as part of their systematic scheme to infiltrate, record, and publish private virtual meetings for commercial gain.

113.   If not through the potential fake registrant, the only conceivable mechanism through which Defendants could have infiltrated Plaintiff's meeting is through the use of a secretive browser extension or similar interception technology.

VI.   **DEFENDANTS' UNLAWFUL CONDUCT IS DELIBERATE, SYSTEMATIC, AND PROFIT-DRIVEN, AND DEFENDANT ROBERTSON HAS SPENT HIS CAREER PERFECTING EXACTLY THIS KIND OF SCHEME.**

114.   Defendants' actions described herein are not accidental, negligent, or the product of ambiguous legal interpretation. They are willful and knowing acts committed for the purposes of financial enrichment and commercial gain.

115.   Defendants' business model for the WebinarTV Platform depends entirely on acquiring large volumes of meeting content rapidly, cheaply, and at scale,

Page 39

CLASS ACTION COMPLAINT

COULSON P.C.

and it accomplishes this through unauthorized recording rather than through any legitimate content acquisition process.

116. This model is consistent with Mr. Robertson's extensive history, throughout which his motto appears to have been "if you have nothing of value to sell, steal it."

117. By acquiring content through unauthorized interception and recording of virtual meetings, Defendants avoid entirely the expense, delay, filtering, and legal accountability that would be associated with obtaining content by legitimate means, such as obtaining informed consent, executing licensing agreements, establishing partnerships with hosts, compensating owners, speakers, organizations, content creators, and videoconferencing platforms, and with complying with the terms of service governing the platforms on which these meetings occur.

118. Without the content acquired through its unlawful practices described herein, Defendants could not have populated, promoted, or profitably operated and grown the WebinarTV Platform to its current scale. The entire content library—apparently every one of the 249,000-plus recordings Defendants advertise—was ostensibly built through the systematic unauthorized recording scheme described in this Complaint. There is no legitimate version of the WebinarTV Platform. The Platform exists because of the theft.

119. Defendants financially benefited and continue to benefit from the unauthorized recordings through multiple, compounding revenue streams, including: increased platform visibility and search engine prominence, user base growth, advertiser and investor attraction, data collection, behavioral analytics, marketing opportunities, AI model training, derivative content creation including AI-generated podcast episodes and summaries, and planned and existing monetization strategies, including the Lead Advantage promotional service described herein.

120. The acquisition and public availability of large volumes of meeting

Page 40

CLASS ACTION COMPLAINT

content makes the WebinarTV Platform appear authoritative, comprehensive, and valuable to users, advertisers, sponsors, and investors—a perception that is entirely manufactured through the theft of others' private communications.

121. In WebinarTV's own community forum, a company representative stated that the core service is "free," but that optional paid services are planned for the future.[44] This statement—made by Defendants themselves in a public forum—is an admission that WebinarTV's business model is designed to achieve sufficient scale through free content before activating direct monetization (such as subscriptions or pay-per-view). The content needed to reach that scale was obtained through the unauthorized recording scheme described herein. In other words, Defendants' own words confirm that the theft of private communications is not incidental to the Platform's business. It is the business.

122. The means through which Defendants access virtual meetings—including registering for meetings under false identities, fabricating community affiliations, bypassing access controls, and deploying purpose-built browser extensions specifically designed to record meetings without generating any notification—require extensive deliberation, planning, and intentional execution. These are not the acts of a platform that stumbled into a gray area of the law. They are the acts of an operation that deliberately built an infrastructure of deception.

123. Defendants' systematic use of fabricated identities, automation, anonymity, covert recording technology, purpose-built browser extensions, and circumvention techniques demonstrates a deliberate scheme designed specifically to evade detection, suppress investigation, and undermine objections by meeting hosts and participants, and continue recording even in the face of explicit prohibitions on recording and unauthorized attendance.

124. These clandestine methods were not selected by accident. Each element

---

[44] https://forum.webinartv.us/d/7-how-does-webinartv-make-money (last accessed May 19, 2026).

**CLASS ACTION COMPLAINT**

COULSON P.C.

of Defendants' infiltration methodology—the fake identities, the browser extensions, the passive surveillance posture, the covert screen capture—was specifically chosen because it evades detection and leaves victims with no practical means of identifying that their meeting has been compromised until after the recording has been published. This is not the methodology of a company operating in good faith. It is the methodology of a surveillance piracy operation.

125. Defendants have deliberately continued these practices despite a substantial and documented record of widespread complaints, investigative reporting, institutional warnings from Stanford University and the Government of Alberta, and direct public notice that their conduct is unlawful, demonstrating a conscious and deliberate disregard for the rights of the individuals whose communications they have stolen.

126. This sustained and deliberate pattern of conduct, including the extraordinary breadth and scale of Defendants' unlawful operations, demonstrates an intentional and conscious disregard for the privacy, dignity, and rights of hundreds of thousands of unsuspecting individuals whose private communications Defendants have intercepted and exploited for profit.

127. Moreover, Defendant Robertson is an experienced and sophisticated technology entrepreneur with extensive experience in the legal ramifications of his chosen vocation, having been a named defendant in major federal litigation on multiple prior occasions. He is not a first-time entrepreneur navigating unfamiliar legal territory. He is a serial litigation defendant who has built and operated multiple businesses on the systematic exploitation of others' content, been held legally accountable for that exploitation on multiple occasions, paid tens of millions of dollars in judgments and settlements as a result and chosen to continue the same fundamental strategy in a new industry with new victims.

128. Indeed, Defendant Robertson built his career on forming businesses that trade on the exploitation of property, content, and intellectual assets of others,

Page 42

**CLASS ACTION COMPLAINT**

operating those businesses until met with legal action, and then either receiving acquisition payouts that reward the exploitation or negotiating settlements that cost far less than the profits generated. He has learned, through repeated experience, that the financial rewards of this strategy apparently exceed its legal costs. WebinarTV is the latest iteration of this strategy—and the first time it has been directed primarily at individuals rather than corporations.

129. Examples of such business ventures—which resulted in federal litigation, judicial findings of wrongdoing, and substantial monetary liability—include:[45]

    a. **MP3.com**: Defendant Robertson founded and operated MP3.com on the unauthorized copying and distribution of copyrighted sound recordings, prompting lawsuits from five major record labels. The United States District Court for the Southern District of New York found that MP3.com had engaged in willful copyright infringement.[46] In that litigated matter, the court awarded Universal Music Group damages of $25,000 per CD that, depending on the final CD count, would likely have resulted in hundreds of millions in a total award.[47] MP3.com ultimately

---

[45] Michael Robertson (businessman), Wikipedia, https://en.wikipedia.org/wiki/Michael_Robertson_(businessman) (last accessed Apr. 21, 2026).

[46] *UMG Recordings, Inc. et al v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 353 (S.D.N.Y. 2000) ("Accordingly, the Court…has determined that plaintiffs are entitled to partial summary judgment holding defendant to have infringed plaintiffs' copyrights."); *UMG Recordings, Inc. et al v. MP3.com, Inc.*, No. 1:00-cv-00472-JSR, 2000 U.S. Dist. LEXIS 13293, at *14 ("*First*, I conclude that defendant willfully infringed plaintiffs' copyright.").

[47] *UMG Recordings, Inc. et al v. MP3.com, Inc.*, No. 1:00-cv-00472-JSR, U.S. Dist. LEXIS 13293, at *18 (S.D.N.Y. Sep. 6, 2000) ("If defendant is right that there are no more than 4,700 CDs for which plaintiffs qualify for statutory damages, the total award will be approximately $ 118,000,000; but, of course, it could be considerably more or less depending on the number of qualifying CDs determined at the final phase of the trial scheduled for November of this year.").

**CLASS ACTION COMPLAINT**

settled for approximately $53.4 million.[48] MP3.com paid additional millions of dollars to settle substantially similar claims brought by other major record labels.[49] Despite—or because of—this record of adjudicated infringement and massive legal liability, MP3.com was acquired by Vivendi Universal, which owned Universal Music Group, for $372 million in 2001.[50] The MP3.com venture is a template: build on stolen content, generate scale, absorb the legal liability, and profit enormously from the acquisition.

b.    **Lindows/Linspire**: Defendant Robertson incorporated a technology company called Lindows, Inc. in July 2001, a name deliberately chosen to trade on Microsoft's famous and well-established "Windows" brand, in direct contravention of Microsoft's registered trademark. This strategy predictably resulted in trademark infringement litigation brought by Microsoft. This dispute concluded with a licensing settlement in which Microsoft paid Defendant Robertson an estimated $20 million—not to compensate Robertson for any legitimate claim, but to induce Robertson's agreement to transfer the Lindows Trademark to Microsoft and change the name of the company to "Linspire, Inc."[51]

c.    **MP3Tunes**: Defendant Robertson formed MP3Tunes, LLC and

---

[48] *UMG Recordings, Inc., et al v. MP3.com, Inc.*, No. 1:00-cv-00472-JSR, ECF No. 162 (Docket Text: "it is ordered, adjudged and decreed that judgment is entered for pltffs…in the amount of $53,400,000").

[49] "MP3.com Settles With Sony Music," ABC News, Aug.23, 2000, https://abcnews.com/Technology/story?id=119530&page=1 (last accessed June 17, 2026).

[50] https://www.sandiegouniontribune.com/2001/05/21/vivendi-universal-buying-mp3com-in-372-million-deal/ (last accessed May 22, 2026).

[51] https://web.archive.org/web/20060325074211/http://query.nytimes.com/gst/fullpage.html?res=990DE6DB103AF933A15754C0A9629C8B63&fta=y (last accessed May 22, 2026).

**CLASS ACTION COMPLAINT**

launched MP3tunes.com, which, like MP3.com, relied on providing users with unauthorized access to copyrighted works at scale. A major record label sued both MP3Tunes, LLC and Defendant Robertson for copyright infringement arising from its "music locker" feature, which allowed users to store and access music files across the internet, including files that had been pirated from unauthorized sources.[52] Following extensive litigation, the jury returned a verdict for plaintiffs against both MP3Tunes LLC and Defendant Robertson, specifically finding Robertson personally liable for infringement, and awarding plaintiffs approximately $48 million in damages. After further litigation, the parties ultimately entered a final consent judgment for the verdicts against Robertson for approximately $39 million and against MP3Tunes, LLC for approximately $38 million.[53]

    d.    **DAR.fm**:[54] DAR.fm ("Digital Audio Recorder") continued this pattern by offering a service that enabled users to record internet radio streams for later listening. While Robertson framed this as a time-shifting tool, Univision sent a cease-and-desist letter to DAR.fm, noting that the service facilitated copyright infringement by enabling subscribers to create and distribute potentially unlimited copies of copyrighted broadcast material.

130.   Defendant Robertson has now adapted and applied this exploitative business model to the virtual meeting industry, systematically infiltrating and recording private meetings—including meetings of vulnerable individuals sharing sensitive personal information about their children, their health, and their

---

[52] *Capitol Records, Inc. v. MP3tunes, LLC*, Case No. 1:07-cv-09931 (S.D.N.Y).

[53]*Capitol Records, LLC et al v. MP3Tunes, LLC and Michael Robertson*, 1:07-cv-09931-WHP-FM (S.D.N.Y.) Stipulation and Order Adjourning Action and Approving Conditional Final Consent Judgment (ECF 760) (Jan. 26, 2018).

[54] https://techcrunch.com/2011/10/05/michael-robertson-univision-dar-fm/ (last accessed Apr. 21, 2026).

Page 45

**CLASS ACTION COMPLAINT**

struggles—and posting those recordings publicly for commercial gain, in deliberate disregard of the privacy rights of every person in every meeting he has stolen.

131. The through-line connecting MP3.com, Lindows, MP3Tunes, DAR.fm, and now WebinarTV is not coincidence or bad luck. It is a deliberate and recurring strategy: identify an industry where valuable content can be appropriated without the knowledge or consent of its creators, build a platform on that appropriation, scale the platform rapidly before legal accountability catches up, and profit from the scale through acquisition, settlement, or monetization—leaving the victims to pursue whatever remedies remain available after the damage is done. Defendant Robertson has executed this strategy five times. Each time, he has done so with full knowledge that his conduct was legally problematic. Each time, the financial returns have apparently justified, in his calculation, the legal risk.

## VII. DEFENDANTS' CONDUCT HAS CAUSED SERIOUS, ONGOING, AND IRREVERSIBLE HARM TO PLAINTIFF, THE CLASS, AND THE PUBLIC — AND WILL CONTINUE TO DO SO UNLESS STOPPED.

132. The harm caused by Defendants' conduct is not abstract or speculative. It is concrete, documented, and ongoing. For Plaintiff, it is personal. His community's most private conversations were stolen and exposed. For the Class, it is systemic. Hundreds of thousands of individuals had their private communications intercepted and published without their knowledge. For the public, it is omnipresent. If this conduct is permitted to continue unchecked, no virtual meeting on any platform can be considered private.

133. To create and grow the WebinarTV Platform, Defendants engaged in a sustained and massive campaign to secretly infiltrate, record, and post hundreds of thousands of virtual meetings—an effort that represents an unprecedented and egregious violation of wiretapping laws and the privacy rights of hosts and participants on an extraordinary scale.

134. Despite the magnitude and severity of Defendants' conduct, their

Page 46

---

**CLASS ACTION COMPLAINT**

unlawful practices remained largely unknown to the vast majority of their victims for an extended period following the inception of the WebinarTV Platform, due in large part to the deliberately secretive nature of Defendants' operations, and many victims remain unaware to this day that their private meetings were recorded and published.

135.   Defendants' practices have exposed, and continue to threaten to expose, the following categories of private, sensitive, and confidential information: (a) personal identifying information, including names, contact information, and biometric data—specifically facial geometry and voiceprints captured in video recordings of participants whose cameras and microphones were active; (b) sensitive personal information, including information about racial and ethnic origin, financial circumstances, political opinions and affiliations, community and social group affiliations, religious beliefs, sexual orientation, and health information; (c) sensitive business information, including strategic plans, internal communications, trade secrets, financial data, and other proprietary and confidential information; and (d) sensitive political information, including internal political strategy, organizational membership, internal research, and internal communications regarding sensitive political activities and positions.

136.   The unauthorized disclosure of each of these categories of information causes distinct and serious harm. The disclosure of biometric data—faces and voices—cannot be undone; a person cannot change their face or voice, and artificial intelligence can clone it. The disclosure of health information, including mental health conditions, learning disabilities, and addiction recovery status, carries the risk of stigma, discrimination in employment and insurance, and damage to personal relationships. The disclosure of financial and business information carries risks of competitive harm, fraud, and identity theft. The disclosure of political and organizational affiliations carries risks of retaliation, harassment, and chilling effects on protected associational activity.

CLASS ACTION COMPLAINT

137. The exposure of the categories of sensitive communications and information places Plaintiff and the Class Members at risk of misuse, discrimination, harassment, and other harmful and unwanted behaviors by any of the unknown number of registered WebinarTV users who have accessed the recordings.

138. Upon information and belief, a significant portion of the individuals whose meetings were recorded and published on the WebinarTV Platform have never received any notification from Defendants and remain entirely unaware that their virtual communications and meetings were surreptitiously intercepted, recorded, and published on the Platform as publicly accessible "webinars."

139. The absence of notification to a large portion of the Class is not an operational oversight. It is a predictable consequence of a business model that depends on maximizing the public accessibility and search engine visibility of stolen content before affected individuals can object and request removal. Every day that passes without notification is another day that private communications remain publicly accessible to an unknown audience.

140. Due to Defendants' actions alleged herein, Plaintiff and the Class Members have suffered and continue to suffer a gross and ongoing invasion of privacy that, by its nature, cannot be fully remedied through monetary compensation alone.

141. Defendants' purported practice of sometimes allowing hosts and participants to request post-hoc removal of their intercepted communications is an inadequate, unreliable, and transparently self-serving attempt to avoid accountability that does not remedy the large-scale unlawful conduct already committed, for the following reasons: First, removal occurs, if at all, only after the unlawful interception and public disclosure have already taken place—meaning the privacy violation is complete and irreversible before the victim has any opportunity to respond. Second, as documented herein, Defendants frequently fail to notify hosts and participants of the recording's publication, meaning many victims never receive the opportunity to

Page 48

**CLASS ACTION COMPLAINT**

request removal at all. Third, as documented herein, Defendants frequently fail to honor removal requests in a timely or complete manner, leaving recordings publicly accessible for weeks or months after the request is submitted. Fourth, removal from the WebinarTV Platform does not address recordings that have been copied, shared, downloaded, or otherwise distributed by Platform users (not to mention artificial intelligence) during the period of public accessibility—harm that is permanent and beyond any remedy Defendants can provide. Fifth, removal does not eliminate the harm already caused by the period of public accessibility, including use, viewing, downloading, or sharing of the recording that occurred before removal.

142. Defendants' unlawful conduct systematically destroys the fundamental expectation of privacy in virtual communications, stripping individuals and organizations of the autonomy and control over their own communications that the ECPA and California law were enacted to protect and inflicting immediate and ongoing harm that compounds with each new unauthorized recording.

143. Defendants' indiscriminate scraping of virtual meetings creates a sweeping and unchecked threat to the privacy and security of any individual or entity that uses virtual meeting platforms for communications—regardless of security measures they implement or the private nature of their meeting.

144. This is not a theoretical concern. As Plaintiff's own experience demonstrates, even a meeting with multi-step registration, personal approval by the host, community connection verification, and explicit recording prohibitions was not safe from Defendants' infiltration. If Plaintiff's meeting could be compromised, no meeting on any platform can be considered secure.

145. Given that virtual meetings are now central to professional work, education, healthcare, mental health support, and personal communication, Defendants' practices do not merely threaten individual privacy. They also endanger the integrity of the virtual communications infrastructure on which modern life depends.

**CLASS ACTION COMPLAINT**

146.    Defendants' actions also directly conflict with and violate their own public statements and promotional representations claiming that the WebinarTV Platform does not host private meetings. These false public representations compound the harm to Plaintiff and the Class by lulling potential victims into a false sense of security. These representations mislead individuals and organizations into believing that their meetings are safe from Defendants' infiltration when they are not and thereby prevent them from taking protective measures they might otherwise adopt.

147.    Defendants do not disclose—anywhere on their Platform, in their promotional materials, or in any public communication—that they systematically scrape the internet for virtual meeting links, infiltrate those meetings using fake registrant identities, and record and publish the contents of those meetings without the knowledge or consent of the host or participants. This concealment is itself a harm: it prevents the public from making informed decisions about how to protect their virtual communications from Defendants' surveillance.

## VIII.    DEFENDANTS WILL CONTINUE THEIR UNLAWFUL CONDUCT UNLESS STOPPED.

148.    Defendants' unlawful and secret infiltration, covert recording, publication, and commercial exploitation of private virtual meetings and the communications of their unsuspecting participants is not a past wrong that has been remedied — it is essential to WebinarTV's ongoing business model and continues unabated.

149.    Defendants' unlawful practices are ongoing. As of the filing of this Complaint, the WebinarTV Platform continues to operate, continues to advertise over 249,000 recordings, and, upon information and belief, continues to infiltrate, record, and publish private virtual meetings without the knowledge or consent of their hosts and participants.

150.    Virtual meeting platforms, such as Zoom, are presently unable or

**CLASS ACTION COMPLAINT**

COULSON P.C.

unwilling to take adequate or effective action to stop Defendants' unlawful activities. As Zoom's own spokesperson acknowledged in response to 404Media's inquiries, Zoom has no technical ability to prevent Defendants from using browser extensions or similar tools to record meetings held on its platform. The inadequacy of platform-level remedies makes judicial intervention the only effective means of stopping Defendants' conduct.

151. Absent the relief sought in this action, Defendants will continue their unlawful surveillance enterprise, eroding privacy protections and threatening the security of virtual meetings on a massive, unprecedented scale. The harm to Plaintiff, the Class, and the public will compound daily as Defendants continue to infiltrate, record, and publish private virtual meetings, and as the recordings already published remain publicly accessible to an ever-growing population of registered WebinarTV users.

152. Absent the relief sought in this action, neither Plaintiff, the Class Members, nor the public at large can be reasonably certain that their private meetings will remain private, rather than being secretly accessed, recorded, processed, distributed, and monetized by Defendants.

153. The only adequate remedy is an injunction requiring Defendants to immediately cease all unauthorized infiltration, recording, and publication of virtual meetings; to remove all recordings from the WebinarTV Platform that were obtained without the informed consent of the host and all participants; to disclose publicly and accurately how the Platform's content is obtained; and to implement verified consent protocols before recording or publishing any virtual meeting going forward. Without such relief, the harm alleged herein will continue, deepen, and spread to an ever-larger population of victims.

**CLASS ACTION COMPLAINT**

## CLASS ALLEGATIONS

### I.      CLASS DEFINITION.

154.   Plaintiff brings this action on behalf of himself and all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23, seeking certification of a Nationwide Class and a California Subclass as defined below.

155.   Plaintiff seeks to represent a Nationwide Class ("Nationwide Class") defined as follows:

> All persons and/or entities in the United States who hosted at least one virtual meeting that Defendants accessed, recorded, and published on the WebinarTV Platform without the express authorization or consent of the host.

156.   Plaintiff also seeks to represent a California Subclass defined as follows:

> All persons and/or entities in California who hosted at least one virtual meeting that Defendants accessed, recorded, and published on the WebinarTV Platform without the express authorization or consent of the host.

157.   The Nationwide Class and the California Subclass are collectively referred to as the "Classes."

158.   Excluded from both Classes are: Defendants, their respective officers, directors, employees, contractors, agents, affiliates, parents, subsidiaries, and legal representatives, as well as their attorneys, successors, heirs, and assigns. Also excluded are any judicial officer presiding over this matter and such officer's immediate family members and judicial staff, and any person who timely and validly opts out of the Classes pursuant to the procedures established by the Court.

159.   Plaintiff reserves the right to amend, modify, narrow, or expand the class definitions based upon information obtained through discovery and further investigation, including the right to define subclasses within the Nationwide Class

Page 52

---

**CLASS ACTION COMPLAINT**

or the California Subclass based on categories of meeting type, method of infiltration, or other criteria that may emerge from discovery.

## II.    ASCERTAINABILITY.

160.    The members of both Classes are ascertainable through objective criteria and through records in the possession, custody, or control of Defendants.

161.    Defendants maintain, upon information and belief, records identifying: (a) every virtual meeting that WebinarTV accessed and recorded, including the meeting's host, platform, date, and unique identifier; (b) every person to whom Defendants sent a notification email following publication of a recording; (c) every removal request received and the disposition of each such request; and (d) the recording and publication date of each meeting posted to the WebinarTV Platform.

162.    These records, obtainable through discovery, provide an objective and administratively feasible basis for identifying Class members without individualized factual inquiries. The class definitions themselves rely on objective criteria—host(s) of a meeting that was recorded and published by Defendants without authorization— that can be determined from Defendants' own records without requiring individualized assessments of each class member's subjective experience.

163.    Additionally, the WebinarTV Platform itself constitutes a publicly accessible index of the recordings at issue. The platform's catalog—which as of the filing of this Complaint advertised over 249,000 recordings—identifies each meeting that was accessed and published by Defendants, providing an independent, publicly verifiable basis for identifying meetings from which class members can be identified.

## III.    NUMEROSITY, FED. R. CIV. P. 23(a)(1).

164.    The members of both Classes are so numerous that joinder of all Class Members in a single proceeding is impracticable. The precise number of Class members is not yet known and will be determined through discovery, but the

Page 53

available evidence establishes that both Classes satisfy Rule 23(a)(1)'s numerosity requirement by an overwhelming margin.

165. **Nationwide Class Numerosity:** The WebinarTV Platform currently advertises over 249,000 recordings. Each recording represents a virtual meeting hosted and attended by one or more hosts , sufficient in the aggregate to place total class membership well into the hundreds of thousands. Joinder of even a small fraction of these individuals would be wholly impracticable. The Class is further identifiable from information and records in the possession, custody, or control of Defendants, including registration records, notification email logs, and the recordings themselves.

166. **California Subclass Numerosity:** California is the most populous state in the nation and, upon information and belief, accounts for a substantial proportion of the virtual meetings recorded by Defendants. Defendants themselves operate from California and have specifically targeted California-based meetings and organizations. The California Subclass independently satisfies Rule 23(a)(1)'s numerosity requirement, with membership likely numbering in the tens of thousands at minimum. Joinder of California Subclass members would be equally impracticable.

IV. **COMMONALITY AND PREDOMINANCE, FED. R. CIV. P. 23(a)(2) AND (b)(3).**

167. Common questions of law and fact exist as to each Class, predominate over any individualized questions, and are capable of class-wide resolution through common proof. The following common questions apply to the Nationwide Class and, where indicated, to the California Subclass as well.

168. Common Questions Applicable to the Nationwide Class:

a. Whether Defendants systematically infiltrated and recorded virtual meetings without the authorization or consent of the host or participants,

**CLASS ACTION COMPLAINT**

b.    Whether Defendants' conduct in infiltration and recording virtual meetings violated the Electronic Communications Privacy Act, 18 U.S.C. § 2511;

c.    Whether Defendants' interception of participants' communications in virtual meetings by means of screen capture and browser extension tools constitutes "interception" of "electronic communications" within the meaning of the ECPA, 18 U.S.C. § 2510(4) and (12);

d.    Whether Defendants' procurement of access to virtual meetings through fabricated registrant identities and fraudulent misrepresentation of their identity and purpose constitutes access "without the authorization" of the host and participants for purposes of the ECPA's party exception analysis under 18 U.S.C. § 2511(2)(d);

e.    Whether any apparent consent Defendants obtained to attend the meetings they recorded was invalid because it was procured through fraud and material misrepresentation;

f.    Whether Defendants acted "intentionally" within the meaning of 18 U.S.C. § 2511(1) in intercepting and recording virtual meetings;

g.    Whether Defendants "disclosed" the contents of intercepted communications within the meaning of 18 U.S.C. § 2511(1)(c) by publishing recordings on the WebinarTV Platform;

h.    The appropriate measure of statutory damages available to Plaintiff and Nationwide Class Members under 18 U.S.C. § 2520(c)(2), including whether each intercepted meeting constitutes a separate "violation" for purposes of the per-violation statutory damages calculation;

i.    Whether Plaintiff and Nationwide Class Members are entitled to equitable relief, including injunctive and declaratory relief under 18 U.S.C. § 2520(b)(1); and

**CLASS ACTION COMPLAINT**

j. Whether Defendants acted willfully for purposes of a punitive damages award under 18 U.S.C. § 2520**(b)(2).

169. Common Questions Applicable to the California Subclass:

a. Whether Defendants' recording of virtual meetings using screen capture and browser extension tools constitutes the use of an "electronic amplifying or recording device" within the meaning of California Penal Code § 632(a);

b. Whether the virtual meetings recorded by Defendants constitute "confidential communications" within the meaning of California Penal Code § 632(c);

c. Whether Defendants acted as unauthorized third-party eavesdroppers "in transit" within the meaning of California Penal Code § 631(a);

d. Whether the virtual meetings recorded by Defendants and the communications transmitted therein were "in transit" within the meaning of California Penal Code § 631;

e. Whether Plaintiff and California Subclass Members had a legally protected right to privacy in their virtual meeting communications under Article I, Section 1 of the California Constitution that Defendants' conduct seriously invaded;

f. Whether Defendants' systematic conduct—including fabricating registrant identities to infiltrate private virtual meetings, covertly recording the contents of those meetings, and publishing the recordings for commercial gain—constitutes "unlawful," "unfair," and/or "fraudulent" business practices within the meaning of California Business & Professions Code § 17200;

g. Whether Plaintiff and California Subclass Members possessed a reasonable expectation of privacy sufficient to sustain claims for invasion

Page 56

of privacy under California common law, and whether Defendants' conduct would be "highly offensive to a reasonable person" as a matter of law;

h. Whether Defendants' publication of recordings of private virtual meetings on the publicly accessible WebinarTV Platform constitutes the "public disclosure" of "private facts" that would be "highly offensive to a reasonable person" and are not of legitimate public concern, under California common law;

i. Whether Defendants were unjustly enriched by the unauthorized interception, recording, and commercial exploitation of Plaintiff's and the California Subclass Members' private virtual meeting communications, and the amount of restitution to which Plaintiff and California Subclass Members are entitled; and

j. The appropriate measure of statutory damages available to Plaintiff and California Subclass Members under California Penal Code § 637.2, including whether each recorded meeting constitutes a separate "violation" for purposes of the per-violation $5,000 statutory minimum.

170. The common questions identified above predominate over any individualized questions for the following reasons:

a. First, the core liability determination for every count in this action turns on Defendants' uniform course of conduct and not on the individual circumstances of each class member. Whether Defendants' method of infiltrating virtual meetings constitutes an ECPA violation, a CIPA violation, or an invasion of privacy is a question that is answered by reference to Defendants' conduct, not by reference to each class member's individual experience.

b. Second, the consent and authorization analysis is common to the entire class. Defendants either obtained valid consent to record virtual

Page 57

CLASS ACTION COMPLAINT

meetings or they did not. The evidence relevant to that question—Defendants' use of fake registrant identities, their failure to disclose their recording intent, their circumvention of access controls—is common to every class member's claim. No individualized inquiry into consent is required because the consent at issue was, by definition, never given.

    c.    Third, the damages available to class members are primarily statutory and do not require individualized proof of actual damages. Those damages that are not statutory can be determined using a methodology that will apply across the class.

    d.    Fourth, the willfulness determination is based entirely on Defendants' conduct and state of mind, not on each class member's individual circumstances. The Robertson history, the deliberate selection of covert recording methodology, and the continuation of the conduct despite documented notice are common evidence that answers the willfulness question for the entire class simultaneously.

    e.    Fifth, the injunctive relief sought is by its nature class-wide relief that cannot meaningfully be disaggregated into individual claims. Either Defendants are enjoined from conducting unauthorized recordings or they are not.

## V.    TYPICALITY, FED. R. CIV. P. 23(a)(3).

171.    Plaintiff's claims are typical of the claims of the Nationwide Class and the California Subclass because Plaintiff and all Class members were subjected to the same unlawful conduct by the same Defendants: the systematic infiltration of their virtual meetings, the covert recording of their communications, and the unauthorized publication of those recordings on the WebinarTV Platform for commercial gain.

172.    Plaintiff's claims arise from the same factual predicate and legal theories as the claims of every other Class member. Like every member of the

COULSON P.C.

Nationwide Class, Plaintiff hosted a virtual meeting that Defendants accessed, recorded, and published without authorization, intercepting his electronic communications in violation of the ECPA. Like every member of the California Subclass, Plaintiff's meeting was recorded in California, his communications were confidential within the meaning of CIPA, and he suffered an invasion of privacy under California law. Plaintiff seeks the same relief as is available to the Class.

173.   No unique legitimate defenses could apply only to Plaintiff.

## VI.   ADEQUACY OF REPRESENTATION, FED. R. CIV. P. 23(a)(4).

174.   Plaintiff David Gaines will fairly and adequately represent and protect the interests of both Classes and has no conflicts of interest with any member of either Class. Plaintiff's interests are identical to those of the Classes: he seeks the same relief on the same legal theories arising from the same course of unlawful conduct. Plaintiff has demonstrated his commitment to this litigation by providing detailed factual information about his experience, cooperating fully with counsel's investigation, and agreeing to serve as class representative with full understanding of the obligations that role entails.

175.   Plaintiff has retained undersigned counsel of Coulson P.C., who are competent and experienced in complex class actions and digital privacy litigation. Coulson P.C. has investigated the facts underlying this action, conducted extensive legal research on the applicable claims, and committed the resources necessary to prosecute this action vigorously on behalf of the Classes. Plaintiff's counsel will vigorously prosecute this action and represent the interests of Plaintiff and the absent Class Members with the expertise, resources, and commitment that this litigation demands.

176.   Plaintiff has no interests antagonistic or adverse to the Classes, is subject to no unique defenses that would make him an inadequate class representative and has no financial or personal relationship with any Defendant that could compromise his representation of the Classes.

COULSON P.C.

## VII.   SUPERIORITY, FED. R. CIV. P. 23(b)(3).

177.   A class action is the superior method for adjudicating the claims of the Nationwide Class and the California Subclass. The Rule 23(b)(3) factors—the interest of members of the class in individually controlling the prosecution of separate actions, the extent of any litigation concerning the controversy already commenced by members of the class, the desirability of concentrating the litigation in this particular forum, and the difficulties likely to be encountered in managing a class action—all favor class treatment here.

178.   **Interest in Individual Control:** The interest of individual Class members in controlling the prosecution of separate actions is negligible compared to the benefits of class treatment. The majority of Class members likely have no knowledge that their meetings were recorded and published by Defendants. Those who do know face the practical reality that individual litigation against a well-funded technology company—involving complex federal privacy law, electronic discovery of a national platform's technical infrastructure, and expert testimony on digital recording methods—is economically impracticable for any individual class member acting alone. The damages available to an individual class member are insufficient to justify individual litigation given the likely cost of prosecuting such an action. Class treatment transforms economically impracticable individual claims into a viable, enforceable collective remedy.

179.   **Existing Litigation:** Plaintiff is not aware of any other litigation currently pending against Defendants arising from the conduct alleged herein. The absence of competing litigation weighs in favor of certifying this action as the vehicle for resolving the claims of the Class.

180.   **Desirability of Concentration in This Forum:** Concentrating this litigation in the Southern District of California is highly desirable. Both Defendants reside and operate in this District, the unlawful conduct was directed from this District, and the records and witnesses necessary to prosecute this action are located

COULSON P.C.

Page 60

**CLASS ACTION COMPLAINT**

COULSON P.C.

in or near this District. A single forum provides consistent, efficient adjudication of claims that are legally and factually identical across the class, eliminating the risk of inconsistent outcomes that would result from adjudicating the same claims in multiple forums simultaneously.

181. **Manageability:** This action is manageable as a class action. The class definitions rely on objective criteria that can be determined from Defendants' own records without individualized inquiry. The primary legal questions are common to all class members and will be resolved through class-wide evidence about Defendants' conduct.

182. Additionally, a class action is superior to other available means of adjudication for the following independent reasons:

a. Absent class-wide relief, Defendants are likely to persist in the harmful conduct alleged herein. As a well-funded commercial enterprise with significant financial incentives to continue its unlawful recording operations, Defendants are unlikely to cease their conduct based on individual actions for monetary damages.

b. Individualized litigation would create a substantial risk of inconsistent or contradictory judgments on the same legal questions. Whether virtual meetings with registration and screening controls are "confidential communications" under CIPA, the facts of Defendants' interception business model, and whether Defendants acted willfully, among others, are all questions that should be resolved consistently across the class. Class adjudication ensures consistent outcomes.

c. The class action vehicle serves the public interest by providing an enforcement mechanism for privacy rights that individual litigation cannot adequately provide. The conduct alleged herein threatens the privacy of every user of virtual meeting technology. A class action that obtains injunctive relief halting Defendants' conduct protects not just Class

**CLASS ACTION COMPLAINT**

members but all future users of virtual meeting platforms, providing a public benefit that extends well beyond the individual interests of any named plaintiff.

## VIII. CERTIFICATION UNDER RULE 23(b)(2)—INJUNCTIVE CLASS.

183. In the alternative, and independently of the Rule 23(b)(3) predominance and superiority analysis, this action is properly certified as a class action under Rule 23(b)(2) because Defendants have acted and continue to act on grounds generally applicable to the Classes, making final injunctive and declaratory relief appropriate as to the Classes as a whole.

184. Rule 23(b)(2) certification is appropriate here for the following independent reasons:

185. First, Defendants' unlawful conduct is uniform and ongoing. Defendants do not infiltrate, record, and publish virtual meetings on a case-by-case, individualized basis. They operate an automated, systematic scheme that applies identically to every meeting they target. This uniformity of conduct is the hallmark of (b)(2) certification: Defendants have "acted or refused to act on grounds generally applicable to the class" because they have applied the same unlawful methodology to every virtual meeting they have recorded.

186. Second, the injunctive relief sought is inherently class-wide. An order requiring Defendants to cease unauthorized infiltration and recording of virtual meetings, to remove existing recordings obtained without informed consent, to make accurate public disclosures about their content acquisition practices, and to implement verified consent protocols before recording any virtual meeting cannot be disaggregated into individual relief. It either applies to Defendants' entire operation, or it means nothing. This is exactly the kind of relief for which Rule 23(b)(2) was designed.

**CLASS ACTION COMPLAINT**

COULSON P.C.

187. Third, the risk of ongoing harm to unidentified future class members supports (b)(2) certification. Defendants' recording operations are continuing. Individuals who have not yet had their meetings recorded and published—but who will if Defendants are not enjoined—have an interest in the injunctive relief sought that cannot be adequately protected through individual litigation or through a damages-only class action. A (b)(2) injunctive class protects future victims, not just past ones.

188. Fourth, (b)(2) certification is appropriate independently of any (b)(3) analysis. Even if some individual damages questions were ultimately to complicate (b)(3) certification on some counts, those complications have no bearing on whether (b)(2) certification is appropriate for the injunctive and declaratory relief claims. The Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011), confirmed that (b)(2) classes are appropriate where a single injunction or declaratory judgment would provide relief to each member of the class. That is precisely the case here.

## IX.   CERTIFICATION UNDER RULE 23(b)(1)—RISK OF INCONSISTENT ADJUDICATIONS.

189. In the alternative, this action may be properly maintained as a class action under Rule 23(b)(1), because:

    a.    the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants.

    b.    the prosecution of separate actions by individual Class members would create a risk of adjudications which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

**CLASS ACTION COMPLAINT**

## FIRST CAUSE OF ACTION

### Violations of Electronic Communications Privacy Act ("ECPA")

### Unlawful Interception & Disclosure, 18 U.S.C. § 2511(1)

### On Behalf of Plaintiff and the Nationwide Class

190. Plaintiff realleges and incorporates by reference all preceding allegations in this Complaint as if fully set forth herein, including specifically the factual allegations concerning Defendants' methods of infiltration and recording set forth above, the independent investigative reporting corroborating those methods, and the allegations concerning Plaintiff's specific meeting.

191. In relevant part, the ECPA prohibits any person from engaging in the following conduct: (a) intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; (b) intentionally using, endeavoring to use, or procuring any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication; (c) intentionally disclosing, or endeavoring to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this section; and (d) intentionally using, or endeavoring to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection.

192. The ECPA protects both the making and receipt of communications by all parties to a communication, including both hosts and participants in virtual meetings.

193. 18 U.S.C. § 2520(a) provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." This private right of action

Page 64

**CLASS ACTION COMPLAINT**

COULSON P.C.

encompasses both Plaintiff, whose communications were intercepted and disclosed as described herein, and all members of the Nationwide Class, whose communications were similarly intercepted and disclosed through Defendants' systematic recording and publication of their virtual meetings.

194. Defendants intentionally intercepted, recorded, and publicly disseminated Plaintiff's communications made and received during his virtual meeting, as described herein. Specifically: Defendants infiltrated Plaintiff's private meeting; used screen capture or similar covert recording technology to intercept and record the full audio and video content of the meeting in real time; and then published the unauthorized recording on the WebinarTV Platform, making it publicly accessible to any registered user within twenty-four hours of the meeting's conclusion.

195. Defendants' interception of Plaintiff's communications occurred simultaneously and in real-time while the meeting was being conducted, constituting an "interception" within the meaning of 18 U.S.C. § 2510(4), which defines "intercept" as the "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."

196. Defendants' interception included the "contents" of Plaintiff's communications within the meaning of 18 U.S.C. § 2510(8), which defines "contents" as "any information concerning the substance, purport, or meaning of" a communication. Defendants' recording included both the audio and visual footage of Plaintiff's meeting, capturing the full substance of every communication made and received during the meeting, including sensitive personal disclosures, as well as the identity, affiliation, and organizational purpose of every participant whose face, name, or voice was captured in the recording.

197. Plaintiff and each member of the Nationwide Class had a reasonable expectation of privacy in their communications and those communications would

**CLASS ACTION COMPLAINT**

not be intercepted by an unauthorized third party because, among other things, the communications: (a) took place in virtual meetings that were not open to the public and were not conducted in a public place; (b) took place in meetings that had registration, screening, and approval protocols intended to restrict attendance to a defined group of authorized participants; (c) took place among a defined, limited group of people with a shared purpose and a mutual expectation of confidentiality; (d) involved sensitive, personal, and in many cases legally protected information including health information, financial information, and information about minor children; (e) involved sensitive communities or organizations that had a reasonable and well-founded expectation that their internal communications would remain confidential; and (f) took place in meetings that specifically prohibited recording and distribution of any kind.

198. Defendants were not parties to Plaintiff's or class members' communications.

199. Plaintiff was not aware of, and did not consent to, Defendants' unlawful interception, recording, use, or dissemination of his virtual meeting and the communications therein.

200. Any purported consent to Defendants' interception, recording, or publication of the meeting's contents that Defendants claim to have received from Plaintiff or any class member was invalid because it was procured entirely by Defendants' deception, fraud, material misrepresentation of their identity, affiliation, and purpose, or Defendants' actions exceeded any scope of consent that could plausibly be implied from participation in a registered virtual meeting.

201. Defendants intentionally intercepted and recorded Plaintiff's oral and electronic communications with a "device" within the meaning of 18 U.S.C. § 2510(5), including but not limited to, upon information and belief: (a) screen recording software; (b) screen capturing software or browser extensions, including browser extensions developed and distributed by WebinarTV itself as documented

Page 66

**CLASS ACTION COMPLAINT**

by CyberAlberta's investigation; (c) automated software applications designed to join, monitor, and record virtual meetings without detection ("bots"); (d) web crawling or scraping tools; and (e) artificial intelligence processing software.

202. Defendants were not acting under color of law at any time relevant to this action to intercept Plaintiff's or any class member's communications. Defendants are private commercial actors with no law enforcement authority or legal justification for intercepting, recording, or disclosing the private communications of meeting participants.

203. Defendants intentionally intercepted Plaintiff's communications for the purpose of recording and publicly publishing them.

204. As a direct and proximate result of Defendants' actions described herein, Plaintiff and each member of the Nationwide Class have suffered concrete and cognizable injuries, including but not limited to: (a) emotional distress and anxiety from learning that Defendants infiltrated, intercepted, transmitted, shared, and commercially exploited their private virtual meetings, and the sensitive communications and personal information contained therein; (b) loss of the inherent value of their private communications and of the right to control the dissemination of their own personal information, while Defendants received substantial financial and commercial benefits from the unauthorized use of that information; (c) invasion of privacy from the secret infiltration, covert recording, and dissemination of their private virtual meetings without knowledge, consent, or authorization; (d) the unauthorized public disclosure of sensitive personal information; and (e) ongoing exposure to the risk of harm arising from the continued public accessibility of the recordings and the unknown number of users who may have viewed, downloaded, or shared them during any period of public accessibility.

205. As a result of Defendants' conduct described herein and pursuant to 18 U.S.C. § 2520, Plaintiff seeks, on behalf of himself and the Nationwide Class Members, the following relief:

**CLASS ACTION COMPLAINT**

a.     Damages pursuant to 18 U.S.C. § 2520(c)(2) in the amount of the greater of (i) actual damages; or (ii) statutory damages of whichever is the greater of $100 per day per violation or $10,000 per violation, for each member of the Nationwide Class;

b.     Punitive damages pursuant to 18 U.S.C. § 2520(b)(2), in an amount sufficient to punish Defendants for their willful, systematic, and commercially motivated violations of the ECPA and to deter similar conduct in the future;

c.     Injunctive and declaratory relief pursuant to 18 U.S.C. § 2520(b)(1), as described in the Prayer for Relief; and

d.     Reasonable attorneys' fees, litigation costs, and other expenses pursuant to 18 U.S.C. § 2520(b)(3).

206.   Plaintiff seeks an injunction pursuant to 18 U.S.C. § 2520(b)(1) as Defendants' conduct is active, pervasive and ongoing and presents—and will continue to present—a serious risk of imminent or actual harm to Plaintiff, the Nationwide Class Members, and the public at large. As described herein, Defendants operate a system that indiscriminately infiltrates virtual meetings across the internet, placing every virtual meeting user at risk of unauthorized surveillance and making it near certain that Plaintiff and the Nationwide Class Members will be subjected to further unlawful interceptions by Defendants in the future if Defendants are not enjoined. Given the deliberately surreptitious nature of Defendants' recording methodology, neither Plaintiff, putative Nationwide Class Members, nor the broader public has any practical way of knowing whether their virtual meeting communications are being intercepted, recorded, or disseminated by Defendants at any given time. Defendants will continue to commit the unlawful acts alleged herein unless and until they are enjoined by this Court.

## SECOND CAUSE OF ACTION

### Violations of the California Invasion of Privacy Act ("CIPA")

Page 68

---

**CLASS ACTION COMPLAINT**

**Unlawful Recording of Confidential Communications**

**Cal. Pen. Code § 632**

**On Behalf of Plaintiff and the California Subclass**

207.   Plaintiff realleges and incorporates by reference all allegations in this Complaint as if fully set forth herein, including specifically the factual allegations concerning Defendants' methods of recording, the independent investigative corroboration of those methods, and the allegations concerning Plaintiff's specific meeting and the sensitive nature of the communications recorded therein.

208.   Section 632 of the California Penal Code was enacted as part of the California Invasion of Privacy Act, which the Legislature declared to be necessary to "protect the right of privacy of the people of this state." Cal. Pen. Code § 630. The Legislature found that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications" and that "the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties." *Id.* Defendants' conduct represents precisely the threat the Legislature identified: the use of advanced technology to conduct covert surveillance of private communications for commercial gain.

209.   California Penal Code Section 632(a) provides that every "person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished" by fine, imprisonment, or both. A person who has been injured by a violation of § 632 may bring a civil action for damages pursuant to California Penal Code § 637.2.

210.   California Penal Code Section 632(b) defines "person" for purposes of § 632 as "an individual, business association, partnership, corporation, limited

Page 69

liability company, or other legal entity." Each Defendant qualifies as "persons" within the meaning of § 632(b) and is therefore independently subject to civil liability under this section.

211. California Penal Code Section 632(c) defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive, or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

212. The virtual meetings recorded by Defendants constitute "confidential communications" within the meaning of § 632(c), including for the following reasons. First, the meetings were conducted in circumstances that reasonably indicated that participants desired their communications to be confined to the authorized attendees: they required registration, screening, and host approval; they were expressly limited to defined participant groups; and often explicitly prohibited recording and redistribution. Second, the meetings were definitionally not "public gatherings"—a term that has the legal meaning gatherings open to all members of the public without restriction. The meetings at issue required advance registration, community connection verification, and host approval, the antithesis of a public gathering. Third, the meetings were not proceedings "open to the public" in any of the categories listed in § 632(c). They were private community and organizational meetings with no governmental, legislative, or judicial character. Fourth, participants in these meetings did not and could not reasonably expect that their communications "may be overheard or recorded" by an unknown third party using deceptive and surreptitious means and technology to access and covertly record such communications without alerting the participants. The reasonable expectation of the participants was precisely the opposite: that their communications were confined to

Page 70

COULSON P.C.

the group of approved and legitimate attendees.

213. Defendants intentionally eavesdropped on and recorded, in their entirety, both the audio and video content of Plaintiff's private virtual meeting and all communications transmitted therein, using electronic recording devices and methods, including but not limited to, upon information and belief: (a) screen recording software; (b) screen capturing software or browser extensions; (c) automated software applications designed to join and record virtual meetings without generating any recording notification to the hosts or participants ("bots"); (d) web crawling or scraping tools used to identify and access meeting links and credentials; and (e) artificial intelligence tools used to process and derive commercial content from the recordings.

214. The electronic recording devices and methods used by Defendants satisfy § 632(a)'s "electronic amplifying or recording device" requirement. Screen capture software, browser extensions, and automated recording bots are "electronic recording devices" within the plain meaning of § 632(a) and within the broad interpretive framework established by California courts.

215. Plaintiff's communications within his private virtual meeting—and the communications of all members of the California Subclass within their respective virtual meetings—were confidential communications within the meaning of § 632 because each of them had a reasonable expectation of privacy in those communications, as described in detail in the First Cause of Action above and in the factual allegations incorporated herein. Plaintiff was not aware of, and did not consent to, Defendants' eavesdropping and unlawful recording of his virtual meetings or of the communications contained therein.

216. Defendants were not parties to Plaintiff's or class members' communications.

217. Plaintiff was not aware of, and did not consent to, Defendants' unlawful interception, eavesdropping, recording, or dissemination of his virtual meeting and

**CLASS ACTION COMPLAINT**

COULSON P.C.

the communications therein.

218.   Any purported consent that Defendants claim to have received from Plaintiff or any class member was invalid because it was procured entirely by Defendants' deception, fraud, material misrepresentation of their identity, affiliation, and purpose, or Defendants' actions exceeded any scope of consent that could plausibly be implied from participation in a registered virtual meeting.

219.   Defendants' recording of Plaintiff's and the California Subclass members' virtual meetings was intentional within the meaning of § 632(a). Defendants did not accidentally or inadvertently record the meetings at issue. They deployed a systematic infrastructure of fake registrant identities, purpose-built browser extensions, and automated recording tools specifically designed to intercept and record virtual meetings at scale. Each element of this infrastructure reflects deliberate, purposeful action. The intentional nature of Defendants' recording is confirmed by the automated, near-instantaneous publication of recordings on the WebinarTV Platform—a publication process that requires deliberate technical implementation, not mere happenstance.

220.   Plaintiff and each member of the California Subclass have been injured by Defendants' unlawful eavesdropping and recording, including the following specific injuries: (a) the gross invasion of their privacy resulting from the secret recording of their confidential virtual meeting communications and the public dissemination of those communications without their knowledge or consent; (b) the loss of the inherent value of their confidential communications and of their right to control the dissemination of their own personal information; (c) emotional distress and anxiety arising from the knowledge that their most private conversations were secretly recorded and made publicly accessible to an unknown audience; (d) the unauthorized public disclosure of sensitive personal information—including, for many subclass members, health information, biometric data, and information about minor children—to registered WebinarTV users; and (e) ongoing exposure to harm

COULSON P.C.

from the continued public accessibility of the recordings.

221. Pursuant to California Penal Code Section 637.2, Plaintiff seeks damages on behalf of himself and the California Subclass Members for each violation of § 632(a) in the amount of $5,000 per violation or three times the amount of actual damages per violation, whichever is greater. Each unauthorized recording of a virtual meeting constitutes a separate violation of § 632(a) for purposes of this calculation. Plaintiff also seeks injunctive relief as described herein and in the Prayer for Relief.

222. Plaintiff seeks an injunction pursuant to California Penal Code § 637.2 as Defendants' conduct is active, pervasive, and ongoing and presents a continuing and irreparable threat to the privacy of Plaintiff, the California Subclass, and all California residents who use virtual meeting platforms for private communications. As described herein, Defendants operate a systematic and automated program that infiltrates virtual meetings across the Internet, placing every virtual meeting user in California at risk of covert surveillance in violation of § 632 and making it near certain that Plaintiff and the California Subclass Members will be subjected to further unlawful recordings by Defendants in the future absent judicial intervention. Defendants will continue to commit the unlawful acts alleged herein unless and until they are enjoined by this Court.

### THIRD CAUSE OF ACTION

**Violations of the California Invasion of Privacy Act ("CIPA")**

**Unlawful Wiretapping and Interception of Communications in Transit**

**Cal. Pen. Code § 631**

**On Behalf of Plaintiff and the California Subclass**

223. Plaintiff realleges and incorporates by reference all allegations in this Complaint as if fully set forth herein, including specifically the factual allegations concerning Defendants' methods of infiltrating and recording virtual meetings, the real-time nature of the interception, and the allegations concerning Plaintiff's

Page 73

COULSON P.C.

specific meeting.

224.   Section 631 of the California Penal Code was enacted alongside § 632 as part of the California Invasion of Privacy Act. While § 632 addresses the recording of confidential communications, § 631 addresses a distinct but related harm: the unauthorized interception of communications while they are in the process of being transmitted. This is the electronic equivalent of tapping a telephone wire to listen in on a conversation as it occurs. The California Legislature enacted § 631 in recognition that the interception of communications in transit is a distinct and serious violation of privacy, separate from and in addition to the harm caused by the recording of completed communications.

225.   California Penal Code Section 631(a) provides that it is unlawful for any person who:

a.   Unauthorized Tapping or Connection: By means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument of any internal telephonic communication system;

b.   Reading or Learning Contents in Transit: Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state;

c.   Use of Intercepted Communications: Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or

d.   Aiding and Conspiring: Aids, agrees with, employs, or conspires

Page 74

**CLASS ACTION COMPLAINT**

with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above.

226. Defendants' conduct implicates each of Section 631(a)'s prohibitions independently.

227. The "wire, line, cable, or instrument" language of § 631(a) encompasses internet-based video communications. The communications transmitted during Plaintiff's virtual meeting are "communications" within the meaning of § 631(a), and the internet infrastructure over which they were transmitted constitutes a "wire, line, cable, or instrument" within the statute's broad coverage.

228. First Prohibition — Unauthorized Tapping or Connection:

a. Defendants violated § 631(a) by intentionally making an unauthorized connection with Plaintiff's and class members' virtual meeting communications by means of various machines, instruments, and contrivances including but not limited to, upon information and belief: (a) screen recording software; (b) screen capturing software or browser extensions, including browser extensions developed and distributed by WebinarTV itself and listed on the Chrome Web Store under WebinarTV's name; (c) automated software applications designed to join and record virtual meetings without generating any recording notification ("bots"); (d) web crawling and scraping tools; and (e) artificial intelligence processing tools.

229. Second Prohibition — Reading or Learning Contents in Transit:

a. Defendants violated § 631(a) by willfully and without the consent of all parties reading, attempting to read, and learning the contents and meaning of Plaintiff's and class members' virtual meeting communications while those communications were in transit— specifically, while the audio and video content of the meetings were being transmitted in real time over the internet via the Zoom platform and

**CLASS ACTION COMPLAINT**

COULSON P.C.

received by the participants.

b.      The "in transit" requirement of § 631(a) is satisfied because Defendants' recording occurred simultaneously and in real time while the meeting communications were being transmitted, not after the fact from a stored recording.

c.      Plaintiff and each member of the California Subclass had a reasonable expectation of privacy in their virtual meeting communications, as described in detail in the First Cause of Action above and in the factual allegations incorporated herein. Defendants intentionally and willfully intercepted, read, and learned the contents of Plaintiff's and class members' virtual meeting communications while those communications were in transit, within the meaning of § 631(a). The recordings Defendants made captured the full substance of every communication transmitted during each meeting—the audio, video, and visual content of the meetings—while that content was being generated and transmitted in real time.

230.   Third Prohibition — Use of Intercepted Communications:

a.      Defendants violated § 631(a) by using the contents of Plaintiff's and class members' virtual meeting communications for multiple commercial purposes, including: (a) publishing the recordings on the WebinarTV Platform as publicly accessible content; (b) generating AI-derived summaries, chapter markers, and podcast episodes from the intercepted content; (c) using the recordings to build and grow the WebinarTV Platform's content library, attract users and investors, and generate revenue; and (d) upon information and belief, using the recordings for AI model training and behavioral analytics. Each of these uses independently violates § 631(a).

b.      Defendants intentionally and willfully used the contents of

Page 76

**CLASS ACTION COMPLAINT**

COULSON P.C.

Plaintiff's and class members' communications—obtained through the unauthorized in-transit interception described above—for commercial purposes including publication on the WebinarTV Platform, AI-derived content generation, platform growth, investor attraction, and the Lead Advantage promotional service, in further violation of § 631(a).

231. Fourth Prohibition — Aiding and Conspiring:

a. Defendant Robertson, as the founder, chief executive officer, and primary decision-maker of WebinarTV, personally directed, authorized, and oversaw the systematic scheme of infiltrating and recording virtual meetings described in this Complaint. Defendant Robertson made the decisions to develop and deploy the browser extensions, record meetings, to gain access to restricted meetings, and to publish the intercepted recordings on the WebinarTV Platform for commercial gain.

b. Defendant WebinarTV aided and facilitated Defendant Robertson's participation in the scheme by providing the technical infrastructure, personnel, and resources necessary to execute the recording operations at scale.

c. Defendants Robertson and WebinarTV aided, agreed with, employed, and conspired with each other and with the fake registrants they deployed to accomplish the unlawful interceptions, recordings, and uses described herein, in further violation of § 631(a). Defendant Robertson personally directed and authorized every material aspect of this conspiracy—the development and deployment of the recording technology, and the publication of the intercepted recordings—making him personally and independently liable under § 631(a) for the unlawful acts of WebinarTV and any others acting at his direction.

232. Defendants acted as unauthorized third-party eavesdroppers, not as legitimate parties to the communications they intercepted. Defendants were not

**CLASS ACTION COMPLAINT**

legitimate parties to Plaintiff's or any class member's communications within the meaning of § 631 because, among other things, Defendants: (a) entered virtual meetings under false pretenses, in order to circumvent registration and screening protocols specifically designed to exclude unauthorized participants; (b) were not members of any intended participant group to which the meetings were limited and had no legitimate basis for attendance; (c) did not disclose their true identity or organizational association; (d) did not disclose their actual purpose of commercially recording and publishing the communications; and (e) did not disclose they were recording the meetings in real time; and (f) actively concealed their recording activity using technology specifically chosen to avoid generating the recording notification protections built in to Zoom, ensuring that participants had no opportunity to object or withdraw from the meeting before their communications were captured.

233. Defendants were not parties to Plaintiff's or class members' communications.

234. Plaintiff was not aware of, and did not consent to, Defendants' tapping, connection, interception, recording, use, or dissemination of his virtual meeting and the communications therein.

235. Any purported consent that Defendants claim to have received from Plaintiff or any class member was invalid because it was procured entirely by Defendants' deception, fraud, material misrepresentation of their identity, affiliation, and purpose, or Defendants' actions exceeded any scope of consent that could plausibly be implied from participation in a registered virtual meeting.

236. Plaintiff and each member of the California Subclass had a reasonable expectation of privacy in their virtual meeting communications, as described in detail in the First Cause of Action above and in the factual allegations incorporated herein. Defendants intentionally and willfully intercepted, read, and learned the contents of Plaintiff's and class members' virtual meeting communications while

Page 78

**CLASS ACTION COMPLAINT**

those communications were in transit, within the meaning of § 631(a). The recordings Defendants made captured the full substance of every communication transmitted during each meeting—the audio, video, and visual content of the meetings—while that content was being generated and transmitted in real time.

237. The acts described in this Cause of Action—the unauthorized connection with Plaintiff's and class members' meeting communications, the willful acquisition of those communications while in transit, the commercial use of the intercepted contents, and the conspiracy between Defendants to accomplish all of the foregoing—each constitute independent violations of California Penal Code § 631(a) for which Plaintiff and the California Subclass are entitled to relief under § 637.2.

238. Plaintiff and each member of the California Subclass have been injured by Defendants' unlawful conduct under § 631, including the following specific injuries: (a) the gross invasion of their privacy resulting from the unauthorized interception of their confidential communications while in transit, without their knowledge or consent; (b) the loss of the inherent value of their private communications and their right to control the contents and dissemination of their own communications; (c) emotional distress and anxiety arising from the knowledge that their private communications were intercepted in real time by an unauthorized commercial surveillance operation; (d) the unauthorized acquisition and commercial exploitation of the substance, meaning, and content of their private communications by Defendants; and (e) the ongoing harm arising from Defendants' continued commercial use of the intercepted communications.

239. Pursuant to California Penal Code §§ 631 and 637.2, Plaintiff seeks damages on behalf of himself and the California Subclass Members for each violation of § 631(a) in the amount of $5,000 per violation or three times the amount of actual damages per violation, whichever is greater. Each unauthorized interception of a virtual meeting's communications constitutes a separate violation

CLASS ACTION COMPLAINT

COULSON P.C.

COULSON P.C.

of § 631(a) for purposes of this calculation. The four independent prohibitions of § 631(a) each constitute separate bases for liability that may independently support the per-violation damages calculation.

240.    Plaintiff seeks an injunction pursuant to California Penal Code § 637.2 as Defendants' conduct constitutes an active, ongoing, and systematic program of unauthorized wiretapping and interception of private communications in transit that is pervasive and presents a continuing and irreparable threat to the privacy of Plaintiff, the California Subclass, and every California resident who uses virtual meeting platforms to communicate privately. As described herein, Defendants operate an automated surveillance system that indiscriminately connects with and intercepts virtual meeting communications across the internet, placing every virtual meeting user in California at risk of unauthorized in-transit interception and making it near certain that Plaintiff and the California Subclass Members will be subjected to further unlawful interceptions by Defendants in the future absent judicial intervention. Neither Plaintiff, California Subclass Members, nor any California resident can know whether their virtual meeting communications are being intercepted in transit by Defendants at any given moment—a state of perpetual surveillance risk that is, by its nature, irreparable and cannot be adequately addressed through monetary damages alone. Defendants will continue to commit the unlawful acts alleged herein unless and until they are enjoined by this Court.

## FOURTH CAUSE OF ACTION

**Violations of the Right to Privacy Under the California Constitution**

**Article I, Section 1**

**On Behalf of Plaintiff and the California Subclass**

241.    Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

CLASS ACTION COMPLAINT

242. Plaintiff realleges and incorporates by reference all allegations in this Complaint as if fully set forth herein.

243. The privacy protection in Article I, Section 1 is self-executing and creates a private cause of action against private parties, not just governmental actors.

244. To state a claim for violation of the California constitutional right to privacy, a plaintiff must establish three elements: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy under the circumstances; and (3) a serious invasion of the privacy interest. Each element is satisfied here, as set forth below.

245. **Legally Protected Privacy Interest Element**: Plaintiff and the members of the California Subclass possessed legally protected privacy interests in their virtual meeting communications within the meaning of Article I, Section 1.

246. The applicable law recognizes two categories of legally protected privacy interests: (1) interests in informational privacy—the right to preclude others from accessing and disseminating information about oneself; and (2) interests in autonomy privacy—the right to make personal decisions and conduct personal activities without observation, intrusion, or interference. Plaintiff and the California Subclass members possessed both categories of legally protected privacy interests in their virtual meeting communications.

247. Informational privacy interests: Plaintiff and the California Subclass members possessed protected informational privacy interests in the private information disclosed during their virtual meetings and captured in Defendants' unauthorized recordings.

248. Autonomy privacy interests: Plaintiff and the California Subclass members possessed protected autonomy privacy interests in conducting private virtual meetings—specifically, the right to gather with a defined group of trusted community members to discuss sensitive personal matters without observation, interference, or surveillance by unknown third parties. Defendants' systematic

Page 81

**CLASS ACTION COMPLAINT**

infiltration of private virtual meetings by commercial surveillance operators—without the knowledge or consent of the participants—strikes at the heart of this protected autonomy interest.

249. **Reasonable Expectation of Privacy Element**: Plaintiff and the members of the California Subclass had a reasonable expectation of privacy in their virtual meeting communications under the circumstances in which those communications were made.

250. The following circumstances are relevant to the reasonable expectation of privacy analysis: the customs and practices of the community or setting; any explicit or implicit representation that the communication was private; the nature of the information communicated; and the presence or absence of any warning that the communication might be observed or recorded. Each of these factors strongly supports a reasonable expectation of privacy here.

251. Customs and practices of the community: The virtual meetings at issue were conducted in accordance with customs and practices that strongly signal privacy. Virtual meetings requiring advance registration, screening of participants, host approval, and the provision of access credentials only to approved attendees are universally understood—by hosts, participants, and the technology industry—to be private gatherings not open to unauthorized third parties. The custom and practice of using registration and access controls on virtual meeting platforms is specifically designed to create and communicate a private environment. Defendants' own platform definition of a "private" webinar—one that "restricts access through various methods" such as passcodes and approval processes—confirms that these customs and practices are widely recognized as markers of a private, restricted gathering.

252. Explicit and implicit representations of privacy: The meetings recorded by Defendants were accompanied by both explicit and implicit representations that the communications were private and would remain confidential. Explicitly: many

Page 82

**CLASS ACTION COMPLAINT**

COULSON P.C.

meetings contained specific statements at the outset prohibiting recording and redistribution of any kind. Implicitly: the entire architecture of a registered, screened, and host-approved virtual meeting communicates to every participant that the gathering is private and that only authorized attendees are present and that the communications are confined to that group. A participant who registers for a meeting, answers screening questions, receives host approval, and is provided access credentials has every reason to believe that the resulting meeting is private. No reasonable participant would expect that a fake registrant had bypassed every one of these controls and was secretly recording the meeting for commercial publication.

253.   Nature of the information communicated: As described herein, the communications intercepted by Defendants included sensitive categories of personal information recognized by California law: health information, information about minor children, biometric identifiers, and financial information. The sensitivity of this information strongly reinforces the reasonableness of the participants' expectation that it would remain private. A parent who discloses their child's disability diagnosis and educational struggles in the context of a private community meeting has a reasonable expectation that those disclosures will not be captured, published, and made commercially available to strangers on the internet.

254.   Absence of warning: Participants in the meetings recorded by Defendants received no warning that an unauthorized commercial surveillance operation had infiltrated the meeting and was recording every communication in real time. To the contrary, the access controls, the registration process, and the explicit recording prohibitions all communicated the opposite: that the meeting was secure and that recording was prohibited. The absence of any warning, combined with the affirmative representations of privacy created by the meeting's security architecture, makes the participants' expectation of privacy not merely reasonable but essentially irrefutable.

255.   **Serious Invasion Element**: Defendants' conduct constitutes a serious

**CLASS ACTION COMPLAINT**

invasion of the legally protected privacy interests identified above. This is the most serious category of privacy invasion recognized by California courts.

256.   The factors relevant to the seriousness of a privacy invasion are: the extent of the intrusion; whether the intrusion was covert or overt; the sensitivity of the information disclosed; whether the intrusion was for commercial gain; and the breadth of the disclosure. Covert surveillance of individuals in a private setting constitutes one of the most serious categories of privacy invasion cognizable under the California Constitution. Each of the relevant seriousness factors is strongly satisfied here.

257. Extent of the intrusion: Defendants' intrusion was total and comprehensive. Their recording captured every word spoken, every face visible, every name displayed, and every communication made and received during the entire duration of each meeting. This was not a limited or incidental capture of information. It was the systematic, wholesale interception of an entire private gathering, from beginning to end, including all participants and all communications.

258. Covert nature of the intrusion: Defendants' surveillance was deliberately and systematically covert. As documented by CyberAlberta's investigation, Defendants specifically selected screen capture and browser extension recording technology over Zoom's built-in recording function because the built-in function generates a notification. Defendants chose their recording method specifically to ensure that hosts and participants would not know they were being recorded. This is not a case of recording that participants might have detected had they been more careful. It is a case of recording that was specifically engineered to be undetectable. The covert nature of Defendants' surveillance is not an incidental feature of their conduct; it is a design specification. The covert nature of the surveillance is itself one of the most significant factors establishing the seriousness of the invasion.

259.   Sensitivity of the information disclosed: As set forth herein,

Page 84

**CLASS ACTION COMPLAINT**

Defendants' recordings captured sensitive categories of information recognized by California law.

260. Commercial purpose: Defendants did not invade the privacy of Plaintiff and the California Subclass for any legitimate purpose. They did so for commercial gain: to build a content library, attract users and investors, and generate revenue through the Lead Advantage promotional service and future monetization strategies.

261. Breadth of disclosure: Defendants published the recordings of Plaintiff's and class members' private meetings on the WebinarTV Platform, where they were freely accessible to any registered user, an audience of unbounded size and composition. The breadth of this disclosure is therefore nearly unlimited: any person in the world who registered for a WebinarTV account could access and view recordings of meetings that were intended to be private, confidential, and restricted to a defined group of authorized participants.

262. The aggregate weight of all five applicable "seriousness" factors compels the conclusion that Defendants' conduct constitutes a serious invasion of Plaintiff's and the California Subclass members' legally protected privacy interests.

263. Plaintiff, on behalf of himself and the California Subclass, seeks all available relief for Defendants' violation of Article I, Section 1 of the California Constitution, including:

a. Compensatory damages for the harm described above, in an amount to be determined at trial;

b. Punitive damages, in an amount sufficient to punish Defendants for their deliberate, systematic, and commercially motivated violation of the California constitutional right to privacy and to deter similar conduct in the future. Defendants' conduct satisfies the malice, oppression, and fraud requirements for punitive damages under California Civil Code § 3294 in that: (i) Defendants acted with malice by consciously disregarding the constitutional privacy rights of Plaintiff and the California Subclass;

Page 85

(ii) Defendants acted with oppression by subjecting Plaintiff and the California Subclass to a systematic program of covert surveillance that was cruel and unjust, created conditions of hardship, and was conducted with conscious disregard of their rights; and (iii) Defendants acted with fraud by infiltrating private meetings through intentional misrepresentation and concealment of their true identity, purpose, and recording activity; and

       c.     Injunctive and declaratory relief as described herein and in the Prayer for Relief.

264. Plaintiff seeks an injunction against Defendants' ongoing violation of the California constitutional right to privacy because the harm caused by Defendants' systematic program of covert surveillance is, by its nature, irreparable. Monetary damages cannot restore the privacy that has been violated, cannot un-disclose the sensitive personal information that has been publicly exposed, cannot reverse the capture of biometric identifiers that participants can never change, and cannot protect Plaintiff, the California Subclass, and the broader California public from the ongoing threat of further unauthorized recordings by Defendants. As described herein, every California resident who uses virtual meeting technology for private communications is at ongoing risk of having those communications secretly intercepted and published by Defendants' automated surveillance system. This is a risk that cannot be adequately addressed through monetary compensation alone and that requires injunctive relief to prevent. Defendants will continue to violate the California constitutional right to privacy of Plaintiff, the California Subclass, and all California residents who use virtual meeting platforms unless and until they are enjoined by this Court.

### FIFTH CAUSE OF ACTION

**Violations of the California Unfair Competition Law ("UCL")**

**Cal. Bus. & Prof. Code § 17200 *et seq*.)**

**On Behalf of Plaintiff and the California Subclass**

Page 86

CLASS ACTION COMPLAINT

COULSON P.C.

265. Plaintiff realleges and incorporates by reference all allegations in this Complaint as if fully set forth herein, including specifically the factual allegations concerning Defendants' methods of infiltrating and recording virtual meetings, the false public representations Defendants have made about WebinarTV's content acquisition practices, Defendants' commercial purpose and financial benefit from the unauthorized recordings, and the harm suffered by Plaintiff and the California Subclass.

266. California Business & Professions Code Section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." The UCL's coverage is intentionally broad. Its three prongs are written in the disjunctive, meaning that a business practice need only satisfy one prong to be actionable. Defendants' conduct satisfies all three prongs independently.

267. Plaintiff has standing to bring this UCL claim on behalf of himself and the California Subclass pursuant to California Business and Professions Code § 17204, as amended by Proposition 64 in 2004. Section 17204 requires that a private plaintiff have "suffered injury in fact and have lost money or property as a result of the unfair competition."

268. Plaintiff has suffered injury in fact and has lost money or property as a result of Defendants' unlawful, unfair, and fraudulent conduct. Specifically: (a) Plaintiff lost the economic value of his private meeting communications—valuable information and content that Defendants appropriated and commercially exploited without authorization or compensation; (b) Plaintiff lost the value of his ability to control the dissemination of his own personal information, communications, and biometric data, which Defendants appropriated for their own commercial benefit; (c) Plaintiff expended time and resources responding to Defendants' unlawful conduct, including investigating the fake registrant, reviewing the unauthorized recording, and taking steps to address the publication of his private meeting; and (d) Plaintiff

Page 87

**CLASS ACTION COMPLAINT**

suffered the loss of the benefit of the access controls and security measures he implemented to protect the privacy of his meeting—measures that Defendants deliberately circumvented, rendering them worthless.

269. Each member of the California Subclass similarly lost money or property as a result of Defendants' conduct through the unauthorized appropriation and commercial exploitation of the economic value of their private communications and personal information. The loss of the economic value of personal information and the right to control its dissemination constitutes "lost money or property" within the meaning of § 17204 as interpreted by California courts.

270. **Unlawful**. Defendants' acts and practices as described herein are "unlawful" within the meaning of § 17200 because they violate multiple federal and state laws, each of which independently establishes the unlawful predicate for this prong, including but not limited to:

a.    Federal Electronic Communications Privacy Act, 18 U.S.C. § 2511(1) as described in the First Cause of Action.

b.    California Invasion of Privacy Act, Cal. Pen. Code §§ 631 and 632 as described in the Second and Third Causes of Action;

c.    California Constitutional Right to Privacy, Article I, Section 1 as described in the Fourth Cause of Action;

d.    California's Computer Access Laws, Cal. Pen. Code § 502: Defendants' conduct was unlawful because it violated, and upon information and belief continues to violate, California's computer access and fraud laws. Defendants accessed Plaintiff's and class members' virtual meeting communications and the computer systems and networks through which those communications were transmitted without permission, by means of fabricated registrant credentials and purpose-built browser extensions designed to circumvent access controls. To the extent the evidence establishes that Defendants' access to virtual meeting platforms

Page 88

and communications constitutes unauthorized access to computer systems within the meaning of § 502(c), such conduct constitutes an additional unlawful predicate act for this prong; and

e.      California common-law privacy rights as described in the Sixth and Seventh Causes of Action.

271.  **Unfair**. Defendants' acts and practices as described herein are "unfair" within the meaning of § 17200. California courts have articulated two tests for the unfair prong in consumer cases: (1) the "balancing test," which asks whether the harm to consumers significantly outweighs the utility of the defendant's conduct; and (2) the "tethering test," which asks whether the conduct threatens an incipient violation of an antitrust law, or violates the policy or spirit of those laws or otherwise significantly threatens or harms competition.

272.  Balancing Test: Defendants' covert and predatory practice of systematically infiltrating and secretly recording unsuspecting participants in virtual meetings, without notice, consent, or authorization is facially immoral, unethical, oppressive, and unscrupulous, and causes substantial injury to consumers. It is particularly egregious because, among other things, Defendants then post and commercially exploit, again without knowledge, consent, or authorization, the recordings publicly on their WebinarTV Platform as commercial content for their own financial and commercial gain.

273.  The harm caused by Defendants' conduct to consumers is extraordinary in both its scope and severity: the privacy of hundreds of thousands of individuals has been violated; sensitive personal information including health data, biometric identifiers, and information about minor children has been publicly disclosed without consent; and the fundamental expectation of privacy in virtual communications has been systematically undermined. Any utility to Defendants from this conduct is purely commercial and is entirely illegitimate given that the content was obtained through fraud and unauthorized interception. The gravity of

**CLASS ACTION COMPLAINT**

the harm to consumers vastly and obviously outweighs any commercial utility to Defendants from their exploitative business model.

274. Moreover, the deliberately surreptitious nature of Defendants' actions means that the vast majority of affected individuals have no practical way of discovering that their meetings have been recorded and publicly posted until after the recording has been published and disseminated to an unknown audience. This informational asymmetry—in which Defendants have complete knowledge of what they have done while their victims have no knowledge at all—is itself a hallmark of an unfair business practice that causes serious harm to consumers who have no ability to protect themselves. As described herein, it is likely that hundreds of thousands of individuals remain unaware that their private virtual meetings are publicly accessible on the WebinarTV Platform.

275. Any utility to Defendants for such a practice is significantly outweighed by the gravity of the harm to consumers caused by the practice. Defendants' conduct fails the UCL balancing test by an overwhelming margin.

276. Tethering Test: Defendants' conduct also violates the policy and spirit of California's wiretapping and privacy laws, which reflect the Legislature's and the voters' strong policy judgment that the covert surveillance of private communications for commercial gain is fundamentally incompatible with the values of a free society. Defendants' systematic commercial surveillance operation directly threatens the policies underlying these laws by normalizing the unauthorized recording of private communications, undermining the effectiveness of access controls and security measures that individuals and organizations implement to protect their privacy, and creating a business model that profits from privacy violations at scale. A business practice that so directly and fundamentally undermines the policy and spirit of California's privacy laws satisfies the tethering test for UCL unfairness independently of the balancing analysis.

277. **Fraudulent.** Defendants' acts and practices described herein are

Page 90

CLASS ACTION COMPLAINT

COULSON P.C.

"fraudulent" within the meaning of § 17200.

278. As described herein, Defendants made and continue to make false statements, deceptive misrepresentations, and material omissions of known facts in connection with the infiltration, interception, recording, and publication of Plaintiff and class members' virtual meetings, including but not limited to the following specific material misrepresentations and omissions:

a. Defendants publicly and falsely represented that the WebinarTV Platform "indexes only free and public webinars" and that private webinars are "not included or supported on the platform";

b. Defendants used false, misleading, and fictitious names, email addresses, and community affiliations to register for and gain access to private virtual meetings;

c. Defendants failed to disclose that they were recording the meetings they attended; and

d. Defendants attended and recorded meetings in violation of explicit prohibitions on recording and redistribution communicated by the host.

279. Defendants' misrepresentations and omissions were material. A reasonable person would consider Defendants' true identity, purpose, and intent to record and commercially publish the meeting to be information of fundamental importance to their decision-making.

280. A reasonable consumer who organized or participated in a virtual meeting that Defendants infiltrated would have behaved differently had Defendants made truthful disclosures. Specifically, they would not have hosted or attended the meeting under conditions that permitted Defendants' attendance, would not have spoken candidly about sensitive matters, and would have implemented additional or different protective measures. The deceptive nature of Defendants' conduct was the direct cause of the harm suffered by Plaintiff and the California Subclass.

**CLASS ACTION COMPLAINT**

281. Plaintiff relied on Defendants' material misrepresentations and omissions to his detriment, as described above.

282. Defendants profited substantially from their unlawful, unfair, and fraudulent practices as described herein, including through: increased platform valuation and credibility, substantial growth in website content and catalog size, increased user base and site traffic and usership, attraction of external investment including the $280,000 seed round, revenue generated through the Lead Advantage promotional service, and planned and existing additional monetization strategies. The benefits Defendants received from their unlawful conduct are directly traceable to and derived from the unauthorized recordings at issue in this action.

283. Plaintiff seeks all available relief under the UCL, including but not limited to restitution and injunctive relief, as well as reasonable attorneys' fees pursuant to California Code of Civil Procedure § 1021.5. Plaintiff lacks an adequate remedy at law for Defendants' ongoing and systematic violations of the UCL. The UCL remedies of restitution and injunctive relief are independent of and in addition to the remedies available under the other causes of action asserted in this Complaint.

284. Plaintiff seeks an injunction pursuant to California Business and Professions Code § 17203 as Defendants' unlawful, unfair, and fraudulent conduct constitutes an ongoing and systematic threat to consumers throughout California and presents a serious risk of imminent and actual harm to Plaintiff, the California Subclass Members, and the public of California at large. The UCL's injunctive relief provision exists specifically to halt ongoing unfair business practices before additional consumers are harmed, which is precisely the relief needed here. As described herein, Defendants operate a systematic and ongoing commercial surveillance program that indiscriminately targets virtual meetings throughout the internet, placing every California virtual meeting user at risk of having their private communications intercepted and commercially exploited and making it near certain that Plaintiff and the California Subclass members will be subjected to further

Page 92

**CLASS ACTION COMPLAINT**

violations by Defendants in the future absent a court order requiring them to cease. Defendants' conduct will continue indefinitely and at increasing scale unless and until it is halted by this Court. Defendants will continue to commit the unlawful acts alleged herein unless and until they are enjoined by this Court.

## SIXTH CAUSE OF ACTION

### Invasion of Privacy - Intrusion Upon Seclusion

### On Behalf of Plaintiff and the California Subclass

285.   Plaintiff realleges and incorporates by reference all allegations in this Complaint as if fully set forth herein, including specifically the factual allegations concerning Defendants' infiltration of Plaintiff's private meeting under false pretenses, the covert recording methodology Defendants deployed, the sensitive nature of the communications recorded, and the harm suffered by Plaintiff and the California Subclass as a result.

286.   The tort of intrusion upon seclusion is recognized under California common law and provides a cause of action to any person whose privacy has been intentionally invaded in a manner that would be highly offensive to a reasonable person. Defendants' systematic commercial surveillance of private virtual meetings constitutes exactly the kind of highly offensive prying the intrusion tort was designed to address.

287.   First element: Intentional Intrusion into a Private Place, Conversation, or Matter: Defendants intentionally intruded upon Plaintiff's and each California Subclass member's private virtual meetings—places, conversations, and matters in which Plaintiff and the subclass members had a reasonable expectation of privacy.

288.   By deliberately infiltrating and surreptitiously intercepting and recording Plaintiff's and each class member's communications without knowledge, consent, or authorization, Defendants intentionally intruded upon Plaintiff's and each class member's meeting.

289.   As described herein, Defendants intentionally designed and executed a

Page 93

CLASS ACTION COMPLAINT

COULSON P.C.

scheme specifically intended to be undetectable—an intrusion that Plaintiff and the other participants could not discover, object to, or prevent at the time it was occurring.

290. Plaintiff had a reasonable expectation of privacy in his meeting and in the communications exchanged during it. Among other things, and as described in detail throughout this Complaint, the meeting: was a private gathering that was intended for a specific group of people and was not conducted in a public place, and it included registration, screening, and approval protocols intended to restrict attendance to a defined group of authorized participants.

291. Plaintiff could not have reasonably expected that Defendants, a commercial surveillance operation operating under a false identity, would infiltrate, record, and commercially publish the meeting for public use and profit without his knowledge, consent, or authorization. No participant in any of the meetings recorded by Defendants could have reasonably expected such conduct. It is, by any measure, an extraordinary and unprecedented violation of the expectations of privacy that are fundamental to private community gatherings of any kind.

292. Plaintiff and the California Subclass had no knowledge of and did not consent to Defendants surreptitious recording and publication of their meetings and the communications therein. Alternatively, any apparent or other "consent" was procured entirely through Defendants' fraud and material misrepresentation of their identity and purpose and is void as a matter of California law.

293. Any purported consent to Defendants' intrusion that Defendants claimed to have received from Plaintiff or any California Subclass member was invalid because it was procured entirely by Defendants' deception, fraud, material misrepresentations of their identity and purpose and/or because Defendants' actions at issue herein exceeded any scope of consent that could plausibly be implied from participation in a registered virtual meeting.

294. Second Element: Highly Offensive to a Reasonable Person:

Page 94

CLASS ACTION COMPLAINT

Defendants' intrusion upon Plaintiff's seclusion would be—and is—highly offensive to a reasonable person.

295.   The following factors are relevant to the highly offensive analysis: (1) the degree of the intrusion; (2) the context, conduct, and circumstances surrounding the intrusion; (3) the intruder's motives and objectives; (4) the setting into which he intrudes; and (5) the expectations of those whose privacy is invaded. Each of these factors is strongly satisfied here, and their cumulative weight compels the conclusion that Defendants' intrusion was highly offensive as a matter of law.

296.   Degree of the intrusion: Defendants' intrusion was complete and total. It was not limited to a particular conversation or a particular piece of information. The degree of this intrusion—wholesale capture of an entire private gathering's communications, from beginning to end, without the knowledge of any legitimate participant—is as complete as an intrusion can be.

297.   Context, conduct, and circumstances: The context of Defendants' intrusion is uniquely disturbing. This was not a passive or inadvertent intrusion. It was a calculated, premeditated infiltration of a private community gathering.

298.   Intruder's motives and objectives: Defendants' motive was purely commercial: to acquire content for their platform, attract users and investors, and generate revenue. They had no legitimate journalistic, educational, governmental, or personal purpose for attending Plaintiff's meeting.

299.   Setting into which the intruder intrudes: Defendants intruded into an inherently private setting, which is their entire business model.

300.   Expectations of those whose privacy is invaded: The participants in the meetings recorded by Defendants expected, and had every reason to expect, that their communications were private and confined to the group of approved attendees. Their expectation of privacy was not merely subjective. It was objectively reasonable, as established in the Second Element analysis above and throughout this Complaint.

301.   A commercial operation that systematically infiltrates private virtual

**CLASS ACTION COMPLAINT**

meetings, deploys purpose-built surveillance technology specifically designed to avoid detection, records the contents of those meetings without the knowledge or consent of any participant, and publishes those recordings for commercial gain—across hundreds of thousands of meetings—is engaged in conduct that is highly offensive to a reasonable person as a matter of the methodology alone.

302. As a direct and proximate result of Defendants' invasion of their privacy, Plaintiff and the California Subclass Members have suffered concrete, serious, and in many respects irreversible harm, including the following specific injuries: violation of their fundamental right to privacy in communications about private, sensitive and/or proprietary information; the unauthorized capture and public disclosure of that information; emotional distress, anxiety, humiliation, and loss of the sense of personal security resulting from the knowledge that their private community meetings were secretly surveilled and their most personal communications made publicly accessible; loss of autonomy and control over their own personal communications, information, and private affairs; the chilling effect on future participation in private virtual gatherings; and ongoing exposure to harm from the continued public accessibility of the recordings, including the risk that persons who have viewed, downloaded, or shared the recordings may use the information contained therein in ways that cause further harm to the affected participants.

303. Plaintiff, on behalf of himself and the California Subclass, seeks and is entitled to all available damages, including actual, compensatory, and punitive damages, and equitable relief, including but not limited to disgorgement of all profits and other benefits Defendants have unjustly received as a result of the unlawful conduct alleged herein. Defendants' conduct—the systematic, premeditated, commercial surveillance of hundreds of thousands of individuals in private virtual meetings under false pretenses—satisfies the malice, oppression, and fraud requirements for punitive damages under California Civil Code § 3294 for the

Page 96

**CLASS ACTION COMPLAINT**

reasons set forth in the Fourth Cause of Action above, which are incorporated herein by reference.

304.   Plaintiff seeks an injunction pursuant to California common law and equity as Defendants' intrusion upon the seclusion of Plaintiff, the California Subclass, and the broader California public is active, ongoing, and irreparable. The irreparable harm from Defendants' ongoing intrusion is particularly clear: every day that Defendants continue to operate their surveillance program, additional individuals are secretly recorded and their private communications published without their consent. Every day that previously published recordings remain accessible on the WebinarTV Platform, the harm from the initial intrusion continues and deepens. No monetary award can compensate for the harm that will be caused to future victims of Defendants' surveillance, or restore the privacy of the past victims whose recordings remain publicly accessible. Only injunctive relief can address these ongoing and future harms. Defendants will continue to intrude upon the seclusion of California residents unless and until they are enjoined by this Court.

### SEVENTH CAUSE OF ACTION

**Invasion of Privacy - Public Disclosure of Private Facts**

**On Behalf of Plaintiff and the California Subclass**

305.   Plaintiff realleges and incorporates by reference all allegations in this Complaint as if fully set forth herein, including specifically the factual allegations concerning the private nature of the meetings recorded by Defendants, the sensitivity of the communications disclosed therein, the public accessibility of the recordings on the Defendants' platform, and the harm suffered by Plaintiff and the California Subclass as a result of Defendants' unauthorized publication of those recordings.

306.   The tort of public disclosure of private facts provides a cause of action to any person whose private facts have been publicly disclosed in a manner that would be highly offensive to a reasonable person and that is not of legitimate public concern. Defendants' unauthorized publication of hundreds of thousands of private

Page 97

virtual meeting recordings on their publicly accessible platform—without the knowledge or consent of the meeting hosts or participants—constitutes precisely the kind of unauthorized public dissemination of private matters that this tort was designed to address.

307. Public Disclosure: Defendants publicly disclosed Plaintiff's and class members' private meeting communications by intentionally publishing unauthorized recordings of those meetings on the Platform. Defendants' disclosure was deliberate and designed to maximize accessibility: the Platform advertised over 249,000 recordings available for viewing, imposed no meaningful barrier to registration, and was accessible to any person in the world. This constitutes public disclosure to the general public.

308. Private Facts: The information contained in Defendants' recordings constitutes "private facts" as they were made in a private context, shared only with a defined group, protected by affirmative security measures, and involve categories of information plainly understood to be private.

309. Highly offensive to reasonable person: Defendants' public disclosure of Plaintiff's and class members' private meeting communications would be highly offensive to a reasonable person of ordinary sensibilities.

310. In addition to the information itself, manner of disclosure independently satisfies the element. Defendants did not publish these communications in a responsible journalistic context or for any legitimate public purpose. They rebranded private community meetings as commercial "webinars" and published them as entertainment products for general consumption.

311. The scale of Defendants' disclosures satisfies the element at the class level. A commercial operator that systematically discloses the private communications of hundreds of thousands of individuals for profit, without their knowledge or consent, engages in conduct that is highly offensive to a reasonable person as a matter of the methodology alone.

312.  Not of legitimate public concern: Plaintiff's private facts disclosed by Defendants were not of legitimate public concern.

313.  The recordings have little or no social value beyond their commercial value to Defendants.

314.  Defendants' motivation was purely commercial. Commercial "entertainment" value, without more, does not constitute the kind of social value that justifies disclosure of private facts.

315.  As a direct and proximate result of Defendants' invasion of their privacy, Plaintiff and the California Subclass Members have suffered concrete, serious, and in many respects irreversible harm, including:

a.  The unauthorized public disclosure of their private and sensitive personal communications to a worldwide audience of unknown composition—a disclosure that cannot be fully undone regardless of any subsequent removal from Defendants' platform;

b.  Emotional distress, humiliation, anxiety, and loss of personal dignity resulting from the knowledge that their private communications were publicly disclosed without their consent and made accessible to strangers worldwide;

c.  The specific harms associated with the disclosure of legally protected categories of information, including risks of stigma, discrimination, and ongoing injury;

d.  Loss of the right to control the narrative of their own private affairs—the "right to shape their own narrative" the public disclosure tort was specifically designed to protect; and

e.  Ongoing exposure to harm from the continued public accessibility of the recordings, including the risk that individuals who have already viewed, downloaded, or shared the recordings will use the information therein in ways that cause additional harm.

CLASS ACTION COMPLAINT

316. Plaintiff and California Subclass Members seek and are entitled to all available relief, including compensatory and punitive damages, in an amount to be determined at trial. Defendants' conduct satisfies the malice, oppression, and fraud requirements for punitive damages under California Civil Code § 3294 for the reasons set forth in the Fourth Cause of Action above, incorporated herein by reference.

317. Plaintiff seeks an injunction pursuant to California common law and equity as Defendants' ongoing public disclosure of private facts—through both the continued accessibility of already-published recordings and the continued publication of new recordings—constitutes irreparable harm that monetary damages cannot adequately address. Future victims of Defendants' ongoing publication scheme cannot be compensated after the fact; they can only be protected in advance. Injunctive relief is therefore not merely appropriate but necessary. Defendants will continue to publicly disclose the private facts of California residents alleged herein unless and until they are enjoined by this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff David Gaines, on behalf of himself, the Nationwide Class, and the California Subclass, respectfully requests that the Court grant the following relief:

A. An order certifying the Nationwide Class as defined herein, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), or in the alternative 23(b)(2) or 23(b)(1);

B. An order certifying the California Subclass as defined herein pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), or in the alternative 23(b)(2) or 23(b)(1);

C. An order appointing Plaintiff David Gaines as Class Representative of the Nationwide Class and the California Subclass;

**CLASS ACTION COMPLAINT**

COULSON P.C.

D. An order appointing Coulson P.C. as Class Counsel pursuant to Federal Rule of Civil Procedure 23(g);

E. Statutory damages pursuant to 18 U.S.C. § 2520(c)(2), on behalf of Plaintiff and each member of the Nationwide Class, in the amount of the greater of actual damages or $100 per day per violation or $10,000 per violation, whichever is greater—with each unauthorized interception and recording of a virtual meeting constituting a separate violation for purposes of this calculation;

F. Punitive damages pursuant to 18 U.S.C. § 2520(b)(2), on behalf of Plaintiff and the Nationwide Class, in an amount sufficient to punish Defendants for their willful, systematic, and commercially motivated violations of the ECPA and to deter similar conduct in the future;

G. Statutory damages pursuant to California Penal Code § 637.2, on behalf of Plaintiff and each member of the California Subclass, for violations of California Penal Code §§ 631 and 632, in the amount of $5,000 per violation or three times the amount of actual damages per violation, whichever is greater—with each unauthorized recording and each unauthorized interception of a virtual meeting's communications in transit each constituting a separate violation for purposes of this calculation;

H. Compensatory damages on behalf of Plaintiff and each member of the California Subclass, for violations of the California constitutional right to privacy, intrusion upon seclusion, and public disclosure of private facts, in amounts to be determined at trial, including damages for the invasion of legally protected privacy interests, the unauthorized public disclosure of sensitive personal information, loss of the right to control the dissemination of personal information, and the chilling effect on future participation in private virtual gatherings;

**CLASS ACTION COMPLAINT**

I. Punitive damages on behalf of Plaintiff and each member of the California Subclass, pursuant to California Civil Code § 3294, for violations of the California constitutional right to privacy, intrusion upon seclusion, and public disclosure of private facts, in an amount sufficient to punish Defendants for their malicious, oppressive, and fraudulent conduct and to deter similar conduct in the future;

J. Restitution as may be appropriate;

K. A preliminary injunction, pending resolution of this action on the merits, enjoining Defendants from continuing to infiltrate, record, and publish private virtual meetings without the informed consent of the host and all participants;

L. A permanent injunction, on behalf of Plaintiff, the Nationwide Class, and the California Subclass, ordering Defendants and all persons acting in concert with them to:

    a. immediately and permanently cease all unauthorized infiltration of virtual meetings, including through fabricated registrant identities, browser extensions, automated recording tools, or any other means designed to access virtual meetings without the informed consent of the host and all participants;

    b. immediately and permanently cease all unauthorized recording of virtual meetings or the communications transmitted therein, without the prior informed written consent of the meeting host and all participants;

    c. immediately and permanently cease the publication, distribution, or other disclosure of any recording obtained without the informed consent of the host and all participants, and remove from the platform all such recordings currently accessible to registered users;

    d. implement and maintain a verified, affirmative consent protocol before recording or publishing any virtual meeting, requiring documented, informed, advanced consent from the meeting host and all participants,

Page 102

**CLASS ACTION COMPLAINT**

COULSON P.C.

identifying the recording party, the purpose of the recording, and the manner in which the recording will be used or published;

e. provide written notification to all persons who hosted or participated in a meeting that was recorded and published on Defendants' platform without their consent, identifying the recording, its current or former accessibility on the platform, and any derivative content derived from the recording including AI-generated summaries and podcast episodes;

f. publicly and accurately disclose on the platform and in all promotional materials how the platform's content is obtained, including whether and how Defendants register for and attend virtual meetings, whether and how they record those meetings, and the basis on which they claim authorization for such recording and publication; and

g. preserve all records, data, and evidence relating to the conduct alleged in this Complaint, including all records of virtual meetings accessed, recorded, and published, all registration information provided by or on behalf of Defendants, all notification emails sent to meeting hosts, and all records of removal requests and their disposition;

M. Declaratory relief pursuant to 18 U.S.C. § 2520(b)(1) declaring that Defendants' systematic infiltration of private virtual meetings constitutes unauthorized interception of electronic communications in violation of 18 U.S.C. § 2511(1); that any apparent consent Defendants obtained was procured through fraud and is invalid under 18 U.S.C. § 2511(2)(d); and that Defendants' publication of recordings of intercepted virtual meetings constitutes unlawful disclosure of intercepted communications under 18 U.S.C. § 2511(1)(c);

N. Reasonable attorneys' fees, costs, and litigation expenses;

O. Pre-judgment and post-judgment interest on all damages awarded at the maximum rate permitted by law;

Page 103

P. Leave to amend this Complaint upon completion of discovery to add additional causes of action or expand or modify the class definitions, including but not limited to claims under California Penal Code § 632.7, California Penal Code § 502, and California Civil Code § 3344, if the factual predicates for those claims are established through discovery; and

Q. Such other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff David Gaines, on behalf of himself, the Nationwide Class, and the California Subclass, hereby demands a trial by jury on all issues so triable.

Dated: June 24, 2026

Respectfully submitted,

**COULSON P.C.**

*/s/ Nicholas A. Coulson*

Nicholas A. Coulson, Esq. (SBN 358903)
13101 Washington Blvd.
Suite 244
Los Angeles, California 90066
T: (313) 644-2685
E: nick@coulsonpc.com

*Counsel for Plaintiff and the Putative Classes*

CLASS ACTION COMPLAINT